662 F.2d 1
 213 U.S.App.D.C. 156, 212 U.S.P.Q. 69,
1981 Copr.L.Dec. P 25,294
 RECORDING INDUSTRY ASSOCIATION OF AMERICA, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL and the United States of America,
Respondents,
Amusement and Music Operators' Association, National Music
Publishers' Association, Inc., National Association of
Recording Merchandisers, American Guild of Authors and
Composers and Nashville Songwriters Association
International, Intervenors.
 Nos. 80-2545, 80-2579, 81-1001, 81-1002, 81-1128, 81-1129
and 81-1233 to 81-1236.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 18, 1981.
Decided June 23, 1981.
Opinion Aug. 27, 1981.
 
 Petitions for Review of Orders of the Copyright Royalty tribunal.
 James F. Fitzpatrick with whom Cary H. Scherman was on the brief, for Recording Industry Association of America, Inc., petitioner in Nos. 80-2545, 80-2579, 81-1001 and 81-1128, intervenor in No. 81-1233.
 Timothy N. Black, Washington, D. C., with whom Stephen A. Weiswasser and Lynn Bregman, Washington, D. C., were on the brief, for CBS Inc., petitioner in Nos. 81-1002 and 81-1129, intervenor in No. 81-1233.
 Frederick F. Greenman, Jr., New York City, with whom Alvin Deutsch, Joseph M. Berl, and Bernard G. Schneider, New York City, were on the brief for American Guild of Authors and Composers, et al., petitioners in Nos. 81-1233, 81-1234, 81-1235 and 81-1236 and intervenors in Nos. 80-2545, 80-2579, 81-1001, 81-1002, 81-1128 and 81-1129.
 Morris B. Abram, New York City, with whom Richard M. Zuckerman and Helen Hershkoff, New York City, were on the brief, for National Music Publishers' Association, Inc., intervenor in Nos. 80-2545, 80-2579, 81-1001, 81-1002, 81-1128 and 81-1129.
 Bruce G. Forrest, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., Charles F. C. Ruff, U.S. Atty., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents. John F. Cordes, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondents.
 Nicholas E. Allen, Philip F. Herrick, James Michael Bailey and Suzanne V. Richards, Washington, D. C., were on the brief, for Amusement and Music Operators' Association, Inc., intervenor in Nos. 80-2545, 80-2579, 81-1001, 81-1002 and 81-1233.
 Charles B. Ruttenberg and James A. Kidney, Washington, D. C., were on the brief, for National Association of Recording Merchandisers, intervenor in Nos. 80-2545, 80-2579, 81-1001, 81-1002, 81-1128, 81-1129, 81-1233, 81-1234, 81-1235 and 81-1236.
 Before WRIGHT, WILKEY and MIKVA, Circuit Judges.
 MIKVA, Circuit Judge:
 
 
 1
 These consolidated cases present various challenges to a rulemaking proceeding of the Copyright Royalty Tribunal ("Tribunal"), in which the Tribunal increased the royalty payable under the compulsory license for making and distributing phonorecords of copyrighted musical works. Our consideration of these petitions was expedited because the new rates were scheduled to become effective on July 1, 1981. Oral argument was heard on June 18, 1981, and on June 23 a judgment was entered, upholding the Tribunal in part, and reversing and remanding in part.
 
 
 2
 We held that the Tribunal acted within its authority in adjusting the royalty rate and in assigning the increase an effective date of July 1, 1981, but that the Tribunal had exceeded its authority in adopting a procedure for interim rate adjustments that would require the Tribunal to convene annual proceedings for the exercise of discretion. The case was remanded to permit the Tribunal to adopt, if it so desired, an alternative scheme of interim rate adjustment. This opinion explains more fully the basis of that judgment.I. THE COMPULSORY LICENSE AND THE COPYRIGHT ROYALTY TRIBUNAL
 
 
 3
 The royalty determinations challenged in this proceeding concern the compulsory license for phonorecords[1] under the Copyright Act, 17 U.S.C. §§ 101-810 (1976). Once the creator of a nondramatic musical work has allowed phonorecords of that work to be produced and distributed, the statute requires him to grant a license upon request to any other person who proposes to make and distribute phonorecords of the work, at a royalty rate set by law. Id. § 115.[2] This compulsory licensing scheme is one of several established by the Copyright Act, and determination of the appropriate royalty rates is one of the principal functions Congress has assigned to the Copyright Royalty Tribunal.[3]
 
 
 4
 The phonorecord compulsory licensing system dates back to 1909, when Congress first extended a composer's copyright protection to include the right to control manufacture of "parts of instruments serving to reproduce mechanically the musical work."[4] Industry representatives expressed a fear that this protection ran the risk of "establishing a great music monopoly" because the Aeolian Company, a manufacturer of player-piano rolls, was acquiring exclusive contract rights from composers and publishers. See H.R. Rep. No. 2222, 60th Cong., 2d Sess. 7 (1909).[5] The music industry has undergone major transformations in the intervening years, but record producers have continued to argue that a danger of monopolization and discriminatory practices exists, and Congress has concluded that a compulsory licensing system is still warranted. See H.R. Rep. No. 1476, 94th Cong., 2d Sess. 107 (1976) U.S.Code Cong. & Admin.News, p. 5659 (hereinafter cited as 1976 House Report); H.R. Rep. No. 83, 90th Cong., 1st Sess. 66-67 (1967).
 
 
 5
 Although the availability of the compulsory license under the 1909 Act has been very important to the structure of the recording industry, the statutory procedures for invoking the license have rarely been used.[6] The usual effect of the system is to make the statutory royalty rate a ceiling on the price copyright owners can charge for use of their songs under negotiated contracts: if the owner demands a higher price in voluntary negotiations, the manufacturer can turn to the statutory scheme, but if the owner is willing to accept less than the statutory rate, he is free to do so.[7] Today, the vast majority of contracts for use of copyrighted musical works involve voluntary payment at precisely the statutory rate. See Adjustment of Royalty Payable Under Compulsory License for Making and Distributing Phonorecords, 46 Fed.Reg. 10,466, 10,479-80 (1981); S.Rep. No. 473, 94th Cong., 1st Sess. 93-94 (1975) (hereinafter cited as 1975 Senate Report). This was not the case earlier in the century, because the statutory rate was then high enough in terms of purchasing power to allow a greater range for individual bargaining.[8] The 1909 Act had set the royalty rate at two cents for each "part" (e. g., disc) manufactured, and this rate remained unchanged until the passage of the 1976 Copyright Act, which increased the statutory rate to 23/4 cents per copy and provided for further adjustments by the Copyright Royalty Tribunal.
 
 
 6
 The inadequacy of the two-cent rate after half a century of economic change had long been recognized. See, e. g., H.R. Rep. No. 83, 90th Cong., 1st Sess. 67 (1967). Nonetheless, the rate increase was continually delayed by the battle over comprehensive copyright law revision and as the years passed, spokesmen for the opposing interests returned to argue over further incremental adjustments. Ultimately Congress found it "neither feasible nor desirable that these rates should be adjusted exclusively by the normal legislative process." 1975 Senate Report at 155.[9] Congress chose instead to make a first, approximate modification of the royalty rate, and to delegate the authority to make future adjustments to an independent tribunal. 17 U.S.C. § 801(b) (1976).
 
 
 7
 The Senate and the House proposed entirely different structures for the independent body that would determine rates. The Senate version provided an ad hoc tribunal convened by the Register of Copyrights whenever a rate proceeding was necessary; the American Arbitration Association was to name three of its members to form the panel, and this choice would be binding unless parties made well-founded objections. S. 22, 94th Cong., 1st Sess. § 803 (1975) (hereinafter cited as Senate Bill), see 1975 Senate Report at 36, 157. Rate adjustments could be vetoed by resolution of either house of Congress, and judicial review was provided only when a party charged that a proceeding for distribution of collected royalty fees was tainted by partiality, corruption, fraud, or other misconduct.[10] Senate Bill §§ 807, 809; see 1975 Senate Report at 37, 158.
 
 
 8
 The House, in contrast, proposed a permanent body, the Copyright Royalty Commission. The Commission would function like a traditional administrative agency. Its three members would be appointed by the President for five-year terms, and its proceedings would be subject to the Administrative Procedure Act, including the normal scope of judicial review. See 1976 House Report at 41-44, 174, 179. The legislative veto was eliminated. Id. at 179.
 
 
 9
 As the conference report stated, the structure finally chosen for the Tribunal "conforms in general to the House bill, but with several changes." H.R. Rep. No. 1733, 94th Cong., 2d Sess. 82 (1976) U.S.Code Cong. & Admin.News, p. 5823 (hereinafter cited as Conference Report ). The Act establishes "an independent Copyright Royalty Tribunal in the legislative branch." 17 U.S.C. § 801(a) (1976).[11] The Tribunal is composed of five commissioners appointed by the President with the advice and consent of the Senate for seven-year terms. Id. § 802. The Tribunal is subject to the APA, and is directed to adopt regulations "governing its procedure and methods of operation" and to accompany its final decisions by a statement of "the criteria that (it) determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its determination." Id. § 803.[12] The APA also governs judicial review of the Tribunal's actions, and there is no legislative veto provision. Id. § 810.
 
 
 10
 Replacement of the legislative veto by the normal process of judicial review was intended to "permit more detailed, thoughtful, and careful review of possibly arbitrary or capricious determinations" of the Tribunal. 1976 House Report at 179, U.S.Code Cong. & Admin.News at p. 5795. Congress also enhanced the protection against arbitrary action by reconstituting the Tribunal as a permanent body. The Register of Copyrights, testifying before a House subcommittee, expressed her belief that the Senate proposal was constitutional, but urged the House to strengthen the Tribunal, emphasizing "that it should have continuity and not be as ad hoc as is laid out in the bill at the moment." 1975 Hearings at 1914-15 (testimony of Ms. Ringer).[13] Assimilation of the Tribunal to the usual agency model provides greater practical and procedural assurances of a coherent royalty system.
 
 
 11
 The present case involves petitions for review of the Tribunal's first redetermination of the royalty rate for the phonorecord compulsory license. The statute requires the Tribunal to institute proceedings for a royalty adjustment on January 1, 1980, and, upon petition, "in 1987 and in each subsequent tenth calendar year." 17 U.S.C. § 804(a)(1), (2)(B) (1976). The rate applicable to the phonorecord license is to
 
 
 12
 be calculated to achieve the following objectives:
 
 
 13
 (A) To maximize the availability of creative works to the public;
 
 
 14
 (B) To afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions;
 
 
 15
 (C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication;
 
 
 16
 (D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.
 
 
 17
 Id. § 801(b)(1). Until that redetermination has been made, the royalty rate is "either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger." Id. § 115(c) (2).
 
 II. THE NEW ROYALTY RATE
 
 18
 The Copyright Royalty Tribunal published notice of its first proceeding to determine the royalty rate for the phonorecord compulsory license on January 2, 1980. 45 Fed.Reg. 63 (1980). In the spring of that year, the Tribunal accepted submissions of economic studies and legal motions, and then commenced evidentiary hearings that lasted forty-six days and involved thirty-five witnesses. See Adjustment of Royalty Payable Under Compulsory License for Making and Distributing Phonorecords, 46 Fed.Reg. 10,466, 10,466-67 (1981). Closing arguments followed in November, and the Tribunal published the new rate in the Federal Register on January 5, 1981. 46 Fed.Reg. 891 (1981). The royalty rate was increased to "four cents, or three-quarters of one cent per minute of playing time or fraction thereof, whichever amount is larger." Id. at 892 (to be codified at 37 C.F.R. § 307.2). The Tribunal also set out a complex system for future interim adjustments in the rate to reflect increases in the average list price of albums. Id. (to be codified at 37 C.F.R. § 307.3-.4). On February 3, the Tribunal published its findings in a detailed statement of the reasons for the adjustment it made in the rate. 46 Fed.Reg. 10,466-87 (1981).
 
 
 19
 Various parties petitioned for review of the Tribunal's action. Parties on the receiving end argued that the royalty was too low, and that the effective date of the increase had been improperly postponed;[14] parties who would be paying the royalty argued that the rate was too high and that the procedures for making interim adjustments were unlawful.[15] We turn first to the contentions concerning the Tribunal's determination of the four-cent royalty rate itself.
 
 
 20
 A. The Adequacy of the Tribunal's Explanation
 
 
 21
 The Copyright Act, as we have noted, requires the Tribunal to "state in detail the criteria that the Tribunal determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its determination." 17 U.S.C. § 803(b) (1976). On the basis of this detailed statement and the record before the Tribunal, judicial review is available in accordance with the provisions of the Administrative Procedure Act. Id. § 810; see Amusement and Music Operators Ass'n v. Copyright Royalty Tribunal, 636 F.2d 531 (D.C.Cir.1980).
 
 
 22
 The copyright users insist that the incorporation of the usual APA review provisions in the statutory scheme demonstrates a congressional desire for "searching judicial scrutiny." Responsive Brief for Petitioners RIAA and CBS Inc. at 13 n.32. They stress the reference in the House report to "the full scope of judicial review provided by Chapter 7 of the Administrative Procedure Act." 1976 House Report at 179, U.S.Code Cong. & Admin.News at p. 5795. The context of this reference makes clear, however, that the House committee did not contemplate intrusive judicial review beyond that ordinarily available under the APA, but rather contrasted the normal APA process of reviewing both the substantive and procedural aspects of all final decisions with the Senate's proposal to limit judicial review to gross procedural irregularities in the royalty distribution proceedings.[16]
 
 
 23
 The Copyright Act permits the Tribunal to conduct its royalty determination as an informal rulemaking.[17] In such proceedings, the APA requires a court to "hold unlawful and set aside agency action, findings and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). Our responsibilities under this "arbitrary and capricious" standard include ascertaining the facts on which the Tribunal relied in making its decision, determining whether those facts have some basis in the record,[18] and judging whether a reasonable decisionmaker could respond to those facts as the Tribunal did. See, e. g., Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1027 (D.C.Cir.1978).
 
 
 24
 When applying the "arbitrary and capricious" standard to the Tribunal's determinations, we must bear in mind that the thoroughness of the factual support an agency can supply for its decision will vary with the nature of the decision being made. See, e. g., FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 813, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978); Industrial Union Dep't v. Hodgson, 499 F.2d 467, 474-75 (D.C.Cir.1974). The setting of the royalty rate is not a routine exercise in historical cost of service ratemaking for a public utility. At least three distinct aspects of the royalty rate scheme increase the deference that this court owes to the Tribunal's conclusions.
 
 
 25
 First, some of the statutory factors require the Tribunal to estimate the effect of the royalty rate on the future of the music industry. The rate should be calculated[19] to "maximize the availability of creative works to the public," but to "minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices." 17 U.S.C. §§ 801(b)(1)(A), (D) (1976). These criteria require determinations "of a judgmental or predictive nature," and the court must be aware that " 'a forecast of the direction in which the future public interest lies necessarily involves deductions based on the expert knowledge of the agency,' " FCC v. National Citizens Comm. for Broadcasting, 436 U.S. at 813-14, 98 S.Ct. at 2121 (quoting FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)). In establishing a permanent Tribunal, Congress expressed its expectation that members would be appointed "from among persons who have demonstrated professional competence in the field of copyright policy," 1976 House Report at 174-75, U.S.Code Cong. & Admin.News at p. 5791, and a court must recognize the contributions of this expertise.
 
 
 26
 Second, other statutory criteria invite the Tribunal to exercise a legislative discretion in determining copyright policy in order to achieve an equitable division of music industry profits between the copyright owners and users. Section 801(b)(1)(C) provides that the royalty rate should "reflect the relative roles of the copyright owner and the copyright user in the product ..." (emphasis added). Similarly, section 801(b)(1)(B) states a congressional purpose to "afford the copyright owner a fair return for his creative work and the copyright user a fair income under existing economic conditions." It is evident that the "fairness" of the return to a songwriter for his creative effort cannot be defined by the traditional methods of cost of service ratemaking; a broader inquiry is called for.[20] Under these circumstances, a court owes considerable deference to the Tribunal's ultimate policy choices. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Action for Children's Television v. FCC, 564 F.2d 458, 479 (D.C.Cir.1977); Federation of Homemakers v. Schmidt, 539 F.2d 740, 743 (D.C.Cir.1976).
 
 
 27
 Finally, the statutory factors pull in opposing directions, and reconciliation of these objectives is committed to the Tribunal as part of its mandate to determine "reasonable" royalty rates. Both the House and the Senate had originally passed bills whose only instruction to the Tribunal was to assure that the royalty rate was reasonable,[21] although the House report had stated objectives that it "anticipated that the Commission will consider."[22] As part of the compromise that produced the final structure of the Tribunal, most of those objectives were written into the statute, see Conference Report at 82, but the Tribunal was not told which factors should receive higher priorities. To the extent that the statutory objectives determine a range of reasonable royalty rates that would serve all these objectives adequately but to differing degrees, the Tribunal is free to choose among those rates, and courts are without authority to set aside the particular rate chosen by the Tribunal if it lies within a "zone of reasonableness." Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968); FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942); Hercules, Inc. v. EPA, 598 F.2d 91, 107 (D.C.Cir.1978).
 
 
 28
 The copyright users attack the Tribunal's explanation of its reasons for choosing the four-cent royalty rate. They insist that the Tribunal has failed to give a sufficient derivation of the four-cent figure, that the Tribunal did not give adequate consideration to certain relevant factors, and that the Tribunal improperly gave weight to other, irrelevant factors. None of these objections require extended discussion,[23] but there may be some value for future Tribunal decisions in a brief treatment of a few of them.
 
 
 29
 The copyright users make a fundamental argument that the Tribunal's decision provides no explanation for the selection of the four-cent figure. We recognize that the character of the Tribunal's explanation leaves room for improvement, but the industry's objection is greatly overstated. Stylistically, the Tribunal's opinion is structured more as a demonstration that the four-cent royalty rate is calculated to achieve the statutory objectives than as a derivation of a 4.00cents numerical figure. But this difference in focus does not obscure the basis of the Tribunal's decision.
 
 
 30
 The Tribunal's explanation of the rate increase is published in the Federal Register, and there is no need to recount it at length here. The Tribunal analyzed the empirical evidence in relation to the statutory criteria. One major target of the copyright owners' submissions, the effect of inflation on their return from the royalty rate, was pertinent to several factors.[24] The Tribunal found that the current rate was too low to provide a financial incentive that would maximize the production of creative works, and rejected copyright users' claim that the effect of a rate increase on price (and thereby on demand) would be substantial enough to diminish the variety of new works that the industry could make available to the public. 46 Fed.Reg. at 10,479. Analyzing the relative contributions of the owners and users and their respective shares of recording industry revenues (as well as the shares taken by a third group, the performing artists), the Tribunal concluded that the return to the copyright owners had unfairly dwindled because of the price ceiling while the return to others had been greatly enhanced.[25] Id. at 10,480, 10,483.
 
 
 31
 In light of the economic evidence, the "relative roles" of the copyright owners and others, and the higher level of remuneration to composers under compulsory licenses abroad, the Tribunal concluded that a fair return to the owners required an immediate increase in the royalty rate "to at least four cents per song." Id. at 10,485. The Tribunal also found that a four-cent royalty would be consistent with the opposing constraints among the statutory criteria, that the rate did not disrupt industry structure and practices or unfairly diminish the income of the copyright users. Id.; id. at 10,481, 10482.[26] The Tribunal's discussion more than satisfies the statutory directive to state in detail the criteria, factual findings, and "specific reasons for its determination," 17 U.S.C. § 803(b) (1976).
 
 
 32
 We conclude that, based on the statutory objectives and the character of the determination they require, the Tribunal has adequately explained its choice of a royalty rate. The copyright users have not shown that the rate chosen lies outside the zone of reasonableness suggested by the Tribunal's factual findings, or that the Tribunal's decision is arbitrary or capricious.
 
 B. The Bargaining Room Theory
 
 33
 The copyright owners assert that the Tribunal misconstrued the purpose of the statutory royalty rate, and set the rate too low because of this misinterpretation. They argue that the two-cent royalty rate set by Congress in 1909 did not become a rigidly prevailing rate until much later in this century. The owners insist that the intent of Congress in 1976 was to revive the flexibility of the original compulsory license system, and that the Tribunal should have set a rate high enough to leave greater room for individual songwriters to negotiate a fair return on their works by bargaining within a range below the statutory ceiling.
 
 
 34
 The Tribunal rejected this argument, explaining that the bargaining room theory was inconsistent with the Tribunal's interpretation of the statutory criteria:The statute requires the Tribunal to establish a "reasonable" royalty rate calculated to achieve the statutory objectives. We adopt the view of RIAA that:
 
 
 35
 A rate that is deliberately fixed above the level that the market can bear so that a lower rate can be negotiated in the marketplace cannot be 'reasonable.' Such a rate would yield more than the 'fair return' to copyright owners mandated by the statute.
 
 
 36
 46 Fed.Reg. at 10,478 (emphasis and footnote omitted). The Tribunal did not agree with RIAA's economic argument that bargaining was impossible,[27] but concluded that the statutory rate should itself be reasonable and should afford the possibility of what the Tribunal considered a fair return to individual songwriters, while leaving them free to accept less if bargaining did take place.
 
 
 37
 We have already observed that the statutory criteria, including the directive that the rate be calculated to "afford the copyright owner a fair return for his creative work," leave the Tribunal substantial discretion to determine policy within the framework of the statute, and that the Tribunal's choices in this area are entitled to deference.[28] The copyright owners argue, however, that the legislative history clearly demonstrates that Congress intended to restore the free play of market forces within a generous price ceiling, and that the Tribunal's ruling must be set aside as inconsistent with that legislative intent.
 
 
 38
 The copyright owners correctly point out that a House committee report issued in 1967 appears to express a legislative intent to adopt the bargaining room approach. See H.R.Rep.No.83, 90th Cong., 1st Sess. 72-74 (1967).[29] This 1967 bill, however, was not enacted into law, and its approach to the compulsory license was significantly changed by the subsequent creation of the Copyright Royalty Tribunal. The choice between a bargaining room theory and a prevailing rate theory of the royalty continued to spark controversy over the years, and the 1967 report's summary of the opposing contentions of the copyright owners and users was repeated with some statistical updating in the 1975 Senate report. See 1975 Senate Report at 93-94. But the conclusions of the 1967 House report were not repeated. Rather, the Senate committee drew no explicit conclusion on this issue, merely expressing its approval of a rate increase to 21/2 cents, and observing that "the publishers and composers will have the opportunity to present their case to the Copyright Royalty Tribunal, an expert body qualified to review the economic evidence in detail." Id. at 94.
 
 
 39
 Thus, the legislative history does not demonstrate that Congress intended to impose a bargaining room rationale on the Tribunal's determination of a reasonable rate.[30] The legislative history indicates only that the bargaining room theory had been considered, and that Congress had chosen to express its will through the statutory criteria instead. These criteria do not explicitly address the bargaining room question, and that dispute can only be resolved through the Tribunal's articulation of principles that flesh out the statutory notions of "reasonable" rates and "fair" returns.
 
 
 40
 The Tribunal's decision that the royalty rate must be reasonable as set, and must not yield an unfairly large return, is based on a reasonable interpretation of the statutory language and is entitled to the deference of this court. Congress established a permanent tribunal, in part, to assure the development of a consistent royalty policy.[31] The copyright owners have not shown that this policy determination should be reversed.[32]
 
 III. ISSUES OF TIMING
 
 41
 Both groups of petitioners find fault with the schedule that the Tribunal designed for adjustment of the royalty rate. The copyright owners contend that delaying the effective date of the increase to four cents until July 1, 1981, was arbitrary and capricious and inconsistent with the legislative intent. The copyright users charge that the Tribunal exceeded its jurisdiction by establishing a structure for interim rate adjustments that requires the Tribunal to meet annually to reevaluate economic conditions in the recording industry.
 
 
 42
 Turning first to the effective date, we note that nothing in the Copyright Act expressly forbids the Tribunal to postpone the effective date of a rate increase, at least when an aggrieved party has sought judicial review.[33] Petitioners appear to recognize this fact, see Brief for Intervenor NMPA at 52, but they argue that postponement frustrates the congressional intent underlying the statute.
 
 
 43
 Section 803(a) of the Copyright Act makes the Tribunal's proceedings subject to the provisions of the APA. The APA does not supply a mandatory effective date for agency rulemaking; rather, it requires an agency to publish most rules "not less than 30 days" before the effective date, 5 U.S.C. § 553(d) (1976), and permits an agency to postpone the effective date of an action pending judicial review, if it "finds that justice so requires," id. § 705. When the statute authorizing agency action fails to specify a timetable for effectiveness of decisions, the agency normally retains considerable discretion to choose an effective date.[34] Petitioners have not demonstrated a congressional intent to withdraw this discretion.[35] We also recognize a certain tension between the copyright owners' position that the rate must become effective immediately after thirty days and their insistence that the Tribunal has the authority to make interim adjustments to the rate before the next full rate proceeding.
 
 
 44
 Nor have petitioners shown that the Tribunal's decision to delay the effective date was arbitrary and capricious. The Tribunal's opinion demonstrates its concern "to minimize disruptive impacts" on the recording industry, and its view that the effective date of a royalty adjustment should be arranged so as to be "less disruptive to the industries." 46 Fed.Reg. at 10,486. Although the Tribunal concluded that a single increase to the full four-cent rate would not be unduly disruptive, id. at 10,481, it was within the Tribunal's discretion to give the industry adequate lead time to prepare for the increase. See, e. g., National Ass'n of Independent Television Producers & Distribs. v. FCC, 502 F.2d 249 (2d Cir. 1974). While we cannot deny that, on this point, the Tribunal's decision was "of less than ideal clarity," nonetheless we must uphold the determination "if the agency's path may reasonably be discerned." See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). That test is met here.
 
 
 45
 We find more troubling, however, the Tribunal's reservation of authority to calculate appropriate interim adjustment figures through annual proceedings. The procedure set out in the Tribunal's rules requires an annual change in the royalty rate "directly proportionate to the change, if any, in the average suggested retail list price of albums" over a designated twelve-month period. 46 Fed.Reg. 892 (1981) (to be codified at 37 C.F.R. § 307.3(a)). The rule goes on to define the "average suggested retail list price of albums" as the average determined from a "representative group" to be chosen by the CRT (i. e., the Tribunal) from "CRT-conducted surveys and/or studies which it may deem necessary, advisable and appropriate," with due consideration to studies submitted by interested parties. Id. (to be codified at 37 C.F.R. § 307.3(b), (c)). Even this procedure may be superseded, however, "(i)n the event that albums made and distributed in the United States without a suggested retail list price distort the average suggested retail list price, so that it does not reflect record price changes in the relevant period." Id. (to be codified at 37 C.F.R. § 307.4(a)). In that case, "CRT-conducted surveys and/or studies" will be used to determine an "average wholesale price" from a "representative group" of albums. Id. (to be codified at 37 C.F.R. § 307.4(b), (c)). It is evident from this description of the Tribunal's intended analysis that the Tribunal expects to wield its expert discretion in selecting representative groups of recordings and deciding whether the average price they yield is unduly distorted.
 
 
 46
 The copyright users argue that "(b)y its ambiguity and breadth, the rule gives the Tribunal standing authority to monitor and regulate the recorded music industry and discretion to reconsider the compulsory rate ab initio each year for the next seven years." Brief for Petitioners RIAA and CBS at 64 (footnote omitted). This contention is somewhat overstated: the Tribunal's rule does not authorize a reexamination of the recording industry's profits or the creative contributions of the owners and the users. All that the procedure requires is an analysis of recording industry pricing patterns. Nonetheless, we conclude that this annual analysis is a task that Congress did not intend for the Tribunal to undertake, and that the Tribunal has overstepped the bounds of its statutory authority by scheduling annual proceedings for the exercise of discretion.
 
 
 47
 The Copyright Act establishes the Tribunal as a permanent body, and authorizes it to settle controversies over the distribution of royalty fees deposited with the Register of Copyrights under sections 111 and 116 whenever the Tribunal determines that such a controversy exists. 17 U.S.C. §§ 801(b)(3), 804(d) (1976). In contrast, the Act does not grant the Tribunal continuous jurisdiction to monitor the fairness of royalty rates. Rather, the statute sets out a precise schedule for initiation and conclusion of proceedings. Id. § 804. Proceedings for the adjustment of the royalty under the compulsory license for phonorecords are to be commenced on January 1, 1980, and thereafter only in response to petitions which may be filed "in 1987 and in each subsequent tenth calendar year." Id. § 804(a)(1), (2)(B). All proceedings are to be "initiated without delay following publication of notice," and the Tribunal is to "render its final decision in any such proceeding within one year from the date of such publication." Id. § 804(e).
 
 
 48
 Because the timetable for proceedings is so rigid, it is conceivable that economic changes unforeseen at the time of the most recent rate proceeding could create an unfairness in the royalty rate that could not be rectified until the next rate proceeding. The statute itself demonstrates that Congress recognized and accepted this possibility: the inflexibility of the timetable is highlighted by the narrow provision for additional proceedings to adjust the royalty rate for secondary transmission by cable systems in the event of certain changes in federal regulatory policy. Cable royalty adjustments to reflect national monetary inflation and changes in rates to cable subscribers are permitted only in 1980 and each subsequent fifth calendar year, see id. § 804(a)(1), (2)(A), but adjustments in response to amendments to certain Federal Communications Commission rules governing cable operation are permitted whenever the FCC implements such changes, id. § 804(b).
 
 
 49
 The statute thus indicates that Congress intended the Tribunal to exercise its discretion to determine royalty rates only at recurring intervals. This indication is fully borne out by the legislative history. The long intervals between Tribunal proceedings were not accidental, but were the product of a continuing process of compromise between opposing interests. See, e. g., 1975 Senate Report at 169 (additional views of Sen. Tunney); 122 Cong.Rec. 3823 (1976) (remarks of Sen. Thurmond). The House report explained its reasons for choosing different intervals for the different royalty rates, in terms demonstrating a belief that the Tribunal would not be reevaluating the economic situation between statutory proceedings:(T)he Committee recognizes that the cable television industry is a developing industry in transition, whereas the recording and jukebox industries are long-established. Therefore, the Committee has chosen periods of different lengths in which the (Copyright Royalty) Commission is to review the rates affecting those industries....
 
 
 50
 The Committee has chosen to stagger the times for review of the various rates established under the bill so as to balance the workload of the Commission.
 
 
 51
 1976 House Report at 173, U.S.Code Cong. & Admin.News at p. 5789.
 
 
 52
 The copyright owners and the Tribunal itself, in defending the Tribunal's proposed interim adjustment system, have not presented any evidence from the legislative history indicating that the conversion of the Tribunal from an ad hoc panel of arbitrators to a permanent agency was intended to change the nature of the Tribunal's functions during the periods between statutory rate proceedings. The reasons given in the House for reconstituting the Tribunal were avoiding possible constitutional infirmities and strengthening the Tribunal's ability to carry out the responsibilities it already possessed. See note 13 supra and accompanying text; 1976 House Report at 174; 122 Cong.Rec. 34,226 (1976) (remarks of Rep. Kastenmeier). Yet it is clear from the Senate debates[36] and from the structure of the Senate's ad hoc Tribunal proposal that no adjustment proceedings were intended for interim years indeed, no proceedings were possible, since the "Tribunal" was to consist of separate panels of arbitrators, each selected for a single rate proceeding in the years designated by the bill, producing its final decision within a year. See Senate Bill §§ 802, 803(a), 804(e); 1975 Senate Report at 36, 157.[37]
 
 
 53
 The Senate debates also contain the fullest elucidation of the harms inherent in frequent rate review, which justified acceptance of the possibility that some inequity would develop during the interim periods. One disadvantage of frequent Tribunal proceedings was the expense to the parties resulting from active administrative and judicial litigation:
 
 
 54
 First of all, the procedure set out in chapter 8 for accomplishing a review of the fee schedules entrusted to the tribunal is a complex one. It will take almost 2 years to complete, even disregarding the possibility of subsequent judicial review. Because this process is time-consuming and complex, it will necessarily be costly for the industries involved, and these costs must obviously be passed on eventually to consumers.
 
 
 55
 122 Cong.Rec. 3148 (1976) (remarks of Sen. Beall). Another ill effect of decreasing the period between adjustments was its unsettling effect on industry planning. "(T)he industry needs rate certainty for a fixed, stable period." Id. (statement of Sen. Abourezk); see id. at 3149 (remarks of Sen. Beall).
 
 
 56
 Thus, the legislative history and the structure of the statute itself evidence a deliberate congressional intent to limit the Tribunal's exercise of discretion in evaluating economic and other factors relating to the fairness of the royalty rate to the review proceedings provided by the statute. This interpretation of the statute is in substantial agreement with the Tribunal's own interpretation, as set out in its regulations. For example, those regulations provide that, after 1980, "for rate adjustment proceedings to comme(n)ce, a petition must be filed by an interested party according to the (statutory) schedule." 37 C.F.R. § 301.61(b) (1980). Furthermore, "(f) ollowing the publication of a final determination in the Federal Register the Tribunal shall not reopen or conduct any further proceedings." Id. § 301.68. Nonetheless, without even alluding to the statutory limits on its authority to conduct proceedings, the Tribunal adopted its scheme for determining through its own expertise an average price of records. See 46 Fed.Reg. at 10,485-86.
 
 
 57
 The Tribunal itself has given no explanation of how these nonstatutory proceedings can be reconciled with the statute, but its counsel argues that the interim proceedings are permissible because they are not the same kind of proceeding as the statutory rate determinations. Rather than a plenary reconsideration of the fairness of the return the rate affords to the copyright owners and users, these proceedings are intended "to maintain the real fee level" in the face of raging inflation. Brief for Respondent Copyright Royalty Tribunal at 48 (emphasis omitted).[38] But regardless of the narrower scope of the intended inquiry, the analysis of record industry pricing structure is sure to be complex and expensive, and possesses ample potential for spawning litigation. Not only would the Tribunal be free to choose among competing "representative samples" in determining average list prices, but it would also have the option of rejecting list prices as "distorted" and switching to a wholesale pricing model. Congress intended that the Tribunal undertake such analyses of the economics of the recording industry only at the widely-spaced recurring statutory proceedings.[39]
 
 
 58
 We do not suggest that the Tribunal must set a flat rate that will remain in effect until the next rate determination in 1987. If economic conditions make it implausible that any numerical rate will remain reasonable over the next seven years, then we see nothing in the statute precluding the Tribunal from adopting a reasonable mechanism for automatic rate changes in interim years. See Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1968). But, whatever the scope of the Tribunal's adjustment powers may be, the mechanism chosen must be well-determined and beyond the Tribunal's discretion, and judicial review of the reasonableness of the chosen mechanism must be available as part of the review of the Tribunal's statutory rate proceeding. It is possible that an automatic adjustment mechanism will subject the copyright owners to some inequities during interim periods, but this is the "delicate balance" that Congress decreed in the Copyright Act. See 122 Cong.Rec. 3823 (1976) (remarks of Sen. Abourezk).
 
 
 59
 We conclude that the Tribunal impermissibly awarded itself discretion to reevaluate economic conditions in the recording industry as a part of its rate adjustment mechanism. The scope of the discretion reserved may be relatively narrow when compared to the plenary review proceedings, but the statute gives the Tribunal no authority to engage in discretionary interim proceedings on this subject at all. Accordingly, the adjustment regulations, 46 Fed.Reg. 892 (1981) (to be codified at 37 C.F.R. §§ 307.3, 307.4), cannot be upheld. This case must be remanded to the Tribunal for further proceedings to allow the Tribunal, if it so desires, to adopt an alternative scheme of interim rate adjustment that does not require annual exercise of discretion.[40] Since this defect in the Tribunal's decision does not impair the reasonableness of the royalty rate as set for 1981, our remand is not intended to obstruct the effectiveness of the four-cent royalty rate as of July 1, 1981.
 
 IV. CONCLUSION
 
 60
 Congress created a permanent Copyright Royalty Tribunal to set fair royalty rates under the compulsory licenses in accordance with a consistent and articulated royalty policy. The statutory criteria determining the reasonableness of the phonorecord royalty rate provide significant guidance to the Tribunal, but they also leave it considerable discretion in charting royalty policy. We expect that in future years the staggering of the Tribunal's workload will permit a fuller explanation of the Tribunal's conclusions, more facilitative of judicial review, but we find on the whole that the Tribunal has adequately explained its reasons and adduced support for its adjustment of the royalty rate.
 
 
 61
 We conclude that the Tribunal's rate adjustment withstands the attacks launched by the various petitioners from their respective sides, and that the Tribunal did not act arbitrarily or unlawfully in deferring the effective date of the new rate. We find, however, that the Tribunal exceeded its authority in adopting its procedure for interim rate adjustments. Accordingly, the case is remanded for the limited purpose of allowing the Tribunal to consider whether it wishes to adopt an alternative scheme for interim adjustments that is within the limits ordained by Congress. In all other respects the Tribunal's decision is upheld.
 
 
 62
 It is so ordered.
 
 
 
 [1]
 The Copyright Act defines "phonorecords" broadly as "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101 (1976)
 
 
 [2]
 The payments are known in the trade as "mechanical royalties," reflecting the language of the 1909 Act, see note 4 and accompanying text infra. Since the present case deals only with the license of phonorecords, no confusion need arise from our omission of the adjective "mechanical." The current provision, section 115, provides, in relevant part:
 In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section.
 (a) Availability and Scope of Compulsory License.
 (1) When phonorecords of a nondramatic musical work have been distributed to the public in the United States under the authority of the copyright owner, any other person may, by complying with the provisions of this section, obtain a compulsory license to make and distribute phonorecords of the work. A person may obtain a compulsory license only if his or her primary purpose in making phonorecords is to distribute them to the public for private use. A person may not obtain a compulsory license for use of the work in the making of phonorecords duplicating a sound recording fixed by another, unless: (i) such sound recording was fixed lawfully; and (ii) the making of the phonorecords was authorized by the owner of copyright in the sound recording or, if the sound recording was fixed before February 15, 1972, by any person who fixed the sound recording pursuant to an express license from the owner of the copyright in the musical work or pursuant to a valid compulsory license for use of such work in a sound recording.
 ....
 (c) Royalty Payable Under Compulsory License.
 ....
 (2) Except as provided by clause (1), the royalty under a compulsory license shall be payable for every phonorecord made and distributed in accordance with the license. For this purpose, a phonorecord is considered "distributed" if the person exercising the compulsory license has voluntarily and permanently parted with its possession. With respect to each work embodied in the phonorecord, the royalty shall be either two and three-fourths cents, or one-half of one cent per minute of playing time or fraction thereof, whichever amount is larger.
 17 U.S.C. § 115 (1976).
 
 
 [3]
 The Tribunal also has jurisdiction to determine rates applicable to the compulsory licenses for secondary transmissions by cable systems, see 17 U.S.C. §§ 111, 801(b)(2) (1976), for public performances by coin-operated phonorecord players, see id. §§ 116, 801(b)(1), and for the use of certain works in connection with noncommercial broadcasting, see id. §§ 118, 801(b)(1). The Tribunal is also responsible for receiving and distributing royalty fees payable under the compulsory cable and coin-operated phonorecord player licenses. See id. §§ 111(d)(3), 116(c), 801(b)(3)
 
 
 [4]
 Act of Mar. 4, 1909, ch. 320, § 1(e), 35 Stat. 1075. The Supreme Court had held in 1908 that unauthorized manufacture of player-piano rolls embodying a musical work did not infringe the composer's copyright. White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908). In expanding the definition of infringement to include mechanical reproductions, Congress specifically mentioned infringement by the use of "disks, rolls, bands, or cylinders." Act of Mar. 4, 1909, ch. 320, § 25(e), 35 Stat. 1081. The current definition of "phonorecord," which attempts to anticipate future technologies, is set out in note 1 supra
 
 
 [5]
 See Henn, The Compulsory License Provisions of the U.S. Copyright Law, at 11 (1956), reprinted in 2 Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 1st Sess. (1960); Rosenlund, Compulsory Licensing of Musical Compositions for Phonorecords Under the Copyright Act of 1976, 30 Hastings L.J. 683, 686 (1979)
 
 
 [6]
 See Adjustment of Royalty Payable Under Compulsory License for Making and Distributing Phonorecords, 46 Fed.Reg. 10,466, 10,482 (1981); see generally Henn, supra note 5; Rosenlund, supra note 5
 
 
 [7]
 The compulsory license applies only to the second and subsequent recordings of a musical work, after the copyright owner has authorized a first recording to be made. He is theoretically free to negotiate a higher price for the first recording. Also, the compulsory license and its royalty rate apply only to use of the musical work, not the other talents of the copyright owner; if the composer is also the performer, he is free to negotiate package prices for further recordings by himself of the same song, and the compulsory license only governs renditions of his song by others. The significance to the royalty rate proceeding of the high sums paid to performing composers is briefly discussed in note 23 infra
 
 
 [8]
 See Part II(B) infra
 
 
 [9]
 The first proposal for a royalty tribunal was apparently made in the Senate in 1969. See Briefing Papers on Current Issues Raised by H.R. 2223, reprinted in 3 Copyright Law Revision: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess. 2089 (1975) (hereinafter cited as 1975 Hearings)
 
 
 [10]
 The judicial review provision of the Senate bill contemplated only
 an order vacating, modifying or correcting a final determination of the Tribunal concerning the distribution of royalty fees
 (a) Where the determination was procured by corruption, fraud, or undue means.
 (b) Where there was evident partiality or corruption in any member of the panel.
 (c) Where any member of the panel was guilty of any misconduct by which the rights of any party have been prejudiced.
 Senate Bill § 809; see 1975 Senate Report at 37, 158.
 
 
 [11]
 The parties do not argue that the characterization of the Tribunal as "in the legislative branch" has any relevance to the issues in this case
 
 
 [12]
 The Senate proposal had directed only that "(e)xcept as otherwise provided by law, the Tribunal shall determine its own procedure," and that "(e)very final decision of the Tribunal shall be in writing and shall state the reasons therefor." Senate Bill § 804(c), (d); see 1975 Senate Report at 36, 157
 
 
 [13]
 See 122 Cong.Rec. 34,226 (1976) (remarks of Rep. Kastenmeier) ("The House changes were made on the advice of constitutional scholars who urged that the Senate version might contain constitutional infirmities."). Correspondence debating the constitutional merits of the Senate proposal was set out as an appendix to the committee hearings. See 1975 Hearings at 1921-25, 1956-60. A different constitutional objection prompted transfer of the power to appoint Tribunal members from the Register of Copyrights to the President. See 1976 House Report at 174; 17 U.S.C. § 802(a) (1976)
 
 
 [14]
 Royalty recipients are represented in this court by the American Guild of Authors and Composers ("AGAC"), and the Nashville Songwriters' Association International ("NSAI"), both petitioners, and the National Music Publishers' Association ("NMPA"), an intervenor. We will refer to these parties generically as the copyright owners. Their argument relating to the effective date of the royalty increase is addressed in Part III infra
 
 
 [15]
 Persons who must pay for the use of copyrighted musical works are represented in this court by the Recording Industry Association of America ("RIAA") and CBS Inc., petitioners, and the intervenors National Association of Recording Merchandisers ("NARM") and Amusement and Music Operators Association ("AMOA"). We will refer to these parties generically as the copyright users. Their argument relating to the system for interim adjustments is addressed in Part III infra
 
 
 [16]
 See note 10 supra and accompanying text. The passage in question reads:
 The Committee concluded that determinations of the Copyright Royalty Commission were not appropriate subjects for regular review by Congress and that the provisions of the Senate bill providing for judicial review were far too restrictive. Therefore, it amended the Senate bill to eliminate automatic Congressional review and to broaden the scope of judicial review. The amended bill provides for the full scope of judicial review provided by Chapter 7 of the Administrative Procedure Act. Congressional review of the activities of the Copyright Royalty Commission will occur as part of the oversight functions of the Judiciary Committees of the House of Representatives and the Senate. The oversight process will provide the Congress sufficient information to determine whether statutory changes are needed at some time in the future.
 The expanded judicial review provided in the Committee amendment will permit much more detailed, thoughtful, and careful review of possibly arbitrary or capricious determinations of the Commission than can be provided by Congressional review.
 1976 House Report at 179, U.S.Code Cong. & Admin.News at p. 5795.
 
 
 [17]
 The Copyright Act gives the Tribunal considerable freedom to determine its own procedures. See 17 U.S.C. § 803(a) (1976). Petitioners do not suggest that Congress intended to limit the Tribunal to proceedings "on the record" requiring the full formal protections of APA §§ 556 and 557, 5 U.S.C. §§ 556, 557 (1976); cf. United States v. Florida East Coast Ry., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973)
 
 
 [18]
 To the extent that "substantial evidence" review may be stricter than "arbitrary and capricious" review (but see, e. g., Pacific Legal Foundation v. Dep't of Transp., 593 F.2d 1338, 1343 n.35 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979)), nothing in the Copyright Act or its legislative history suggests a legislative intent to impose the more stringent standard in review of the Tribunal's decisions. The dictates of the APA, incorporated by reference in 17 U.S.C. § 810 (1976), apply the "substantial evidence" standard to rulemaking only when it is "reviewed on the record of an agency hearing provided by statute," 5 U.S.C. § 706(2)(E); see, e. g., Pacific Legal Foundation, 593 F.2d at 1343 n.35. Congress did not make such provision for the proceedings of the Tribunal
 While we have found the evolution of the judicial review provisions of the Copyright Act more instructive than reliance on isolated phrases, we note in response to the copyright users' arguments that none of the congressional reports made allusion to the "substantial evidence" standard. Indeed, the House report spoke specifically of "review of possibly arbitrary or capricious determinations of the Commission." 1976 House Report at 179, U.S.Code Cong. & Admin.News at p. 5795. We do not place great weight on this language, but it hardly expresses a desire on the part of the committee to go beyond the usual scope of review of informal rulemaking under the APA.
 
 
 [19]
 Without choosing among competing dictionaries, we agree that the natural reading of the language of § 801(b)(1) is that the royalty rate is to be "calculated to achieve the following objectives" in the sense of being designed or adapted for the achievement of those objectives, not in the sense of being the result of a rigorous mathematical derivation. See Brief for Respondent Copyright Royalty Tribunal at 30
 
 
 [20]
 We recognize, see note 15 supra, that the copyright owners who receive royalties include both the composers themselves and their publishers (as well as other persons)
 
 
 [21]
 See Senate Bill § 801(b)(1); 1975 Senate Report at 36, 155; 115 Cong.Rec. 3855 (1976) ("to make determinations concerning the adjustment of the copyright royalty rates as provided in sections 111, 115, 116, and 118 so as to assure that such rates are reasonable"); 1976 House Report at 41, 173; 115 Cong.Rec. 32,004 (1976) ("to make determinations concerning the adjustment of reasonable copyright royalty rates as provided in sections 115 and 116"). Both bills provided more elaborate standards for the cable transmission royalty under section 111. The House bill also provided that the phonorecord royalty adjustments could only be "based upon relevant factors occurring subsequent to the date of enactment of this Act;" the House receded on this latter provision in conference. Conference Report at 82; 17 U.S.C. § 801(b)(1) (1976)
 
 
 [22]
 1976 House Report at 173-74, U.S.Code Cong. & Admin.News at pp. 5789-5790. The report stated:
 No specific standards governing the establishment or adjustment of rates by the Commission, other than rates for cable transmissions, have been detailed in the legislation, because the Committee did not wish to limit the factors that the Commission might consider in a world of constantly changing economics and technology. However, it is anticipated that the Commission will consider the following objectives in determining a reasonable rate under sections 115 and 116:
 (1) The rate should maximize the availability of diverse creative works to the public.
 (2) The rate should afford the copyright owner a fair income, or if the owner is not a person, a fair profit, under existing economic conditions, in order to encourage creative activity.
 (3) The rate should not jeopardize the ability of the copyright user
 (a) to earn a fair income, or if the user is not a person, a fair profit, under existing economic conditions, and
 (b) to charge the consumer a reasonable price for the product.
 (4) The rate should reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.
 (5) The rate should minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.
 Id.
 
 
 [23]
 The less substantial claims include the objection of AMOA that the Tribunal did not give sufficient consideration to the economic plight of jukebox operators as a major class of record consumers, see Brief for Intervenor AMOA, and RIAA's assertion that the Tribunal erred by giving greater credence to the RIAA's incompletely disclosed data submissions where the data weighed against the Association's positions than where the data weighed in favor of them, see Responsive Brief for Petitioners RIAA and CBS Inc. at 28-30; cf. note 32 infra. RIAA also attacks the Tribunal's conclusion that information concerning rates of compensation under foreign compulsory licenses "is relevant(,) because it provides one measure of whether copyright owners in the United States are being afforded a fair return." 46 Fed.Reg. at 10,483. We see nothing in the statute or its legislative history that requires the Tribunal to close its eyes to conditions in other countries while deciding what a fair return to a composer should be
 Finally, the Tribunal acted well within its discretion when it refused to set the rate of compensation for all copyright owners at a level that would avoid excessive enrichment of songwriters who perform their own works. See 46 Fed.Reg. at 10,484. The Tribunal found that designation of a small portion of the singer-songwriters' fees as a royalty for use of the composition is merely conventional, and does not change the fact that the heavy compensation of these performers is a product of bargaining, not of the compulsory license system. Id. The Tribunal was entitled to conclude that the wealth of the singer-songwriters does not justify denying nonsinging songwriters a fair return, and that evidence documenting this wealth was essentially irrelevant to the royalty proceeding.
 
 
 [24]
 Petitioners RIAA and CBS take a somewhat ambiguous position on the propriety of considering inflation at all in the royalty rate proceeding, see Brief for Petitioners RIAA and CBS Inc. at 39-40 & n.104. It is obvious, however, that the purchasing power of the return to the copyright owners is an essential element in determining the fairness of the return, see 17 U.S.C. § 801(b)(1)(B) (1976), in evaluating the effectiveness of the rate in maximizing the availability of musical works, see id. § 801(b)(1)(A), and in setting a rate that reflects the relative roles of copyright owners and users, see id. § 801(b)(1)(C), particularly where the owners' rate is fixed by law and the users remain free to charge what the market will bear
 We agree with petitioners that the Tribunal would be acting improperly if it ignored the statutory criteria altogether and set the rate merely by multiplying the interim figure in § 115(c)(2) by the increase in the consumer price index over some interval of time. See Brief for Petitioners RIAA and CBS Inc. at 34-46. Petitioners present no genuine evidence, however, that this was the Tribunal's method. The Tribunal's exhaustive proceedings and its twenty-page opinion would be a massive exercise in hypocrisy if petitioners were correct. Petitioners calculate that an appropriate choice of base period would give a roughly equivalent number, they lift out of context the Tribunal's allusions to inflation as a factor affecting the fairness of a given royalty rate, and they purport to reconstruct backroom bargaining by reading between the lines in the brief dissent of Tribunal Commissioner Burg, see 46 Fed.Reg. at 10,486-87. This is hardly a showing that would rebut the strong presumption of regularity in administrative decisionmaking. See, e. g., Hercules, Inc. v. EPA, 598 F.2d 91, 123 (D.C.Cir.1978).
 
 
 [25]
 The Tribunal recognized that increasing sales volume could theoretically maintain the fairness of the songwriter's rate of return while inflation eroded the statutory rate, but found that the empirical evidence demonstrated that inflation had greatly outstripped the slight increases in record sales. 46 Fed.Reg. at 10,485. The Tribunal also found, for example, that from 1955 to 1979 composers' royalties had declined from being slightly greater than performers' royalties to barely a quarter of the performers' share, id. at 10,485, and that from 1964 to 1974 copyright owners' royalty payments declined from 11.2% of wholesale record price to 7.2%, id. at 10,481
 
 
 [26]
 In determining the economic effect of the royalty rate increase on record producers, wholesalers, retailers, and the consuming public, the Tribunal rejected the copyright users' analysis, finding that "(t)he evidence shows that increases at wholesale do not have an automatic multiplier effect through the distribution chain to the retail level," 46 Fed.Reg. at 10,484, and that record companies had demonstrated on other occasions their ability to absorb some cost increases, including the 1978 increase in the royalty rate for the compulsory license. Id.; id. at 10,482. The copyright users attempt to challenge these findings, see Brief for Petitioners RIAA and CBS Inc. at 33 n.91, Brief for Intervenor NARM passim. Suffice it to say that substantial evidence supports the Tribunal's findings that, while the recording industry may pass on the cost increase to the consumer, past practices make it equally possible that it may not, and that record price increases have not been characterized by an automatic, rigid "multiplier" effect
 
 
 [27]
 See 46 Fed.Reg. at 10,482, 10,483. RIAA's position on the impossibility of bargaining was set out in its Proposed Findings of Fact and Conclusions of Law, at 190-208, Joint Appendix at 599-617. Contrary to the assertions of RIAA, see Responsive Brief for Petitioners RIAA and CBS Inc. at 22-23, we find the Tribunal's approach to the role of bargaining both internally consistent and supported by substantial evidence in the record
 
 
 [28]
 See text accompanying note 20 supra. Furthermore, the Tribunals' interpretation of the statute that it is charged to execute is entitled to some deference. See Miller v. Youakim, 440 U.S. 125, 144 n.25, 99 S.Ct. 957, 968 n.25, 59 L.Ed.2d 194 (1979)
 
 
 [29]
 For example, the committee stated:
 The committee is setting a statutory rate at the high end of a range within which the parties can negotiate, now and in the future, for actual payment of a rate that reflects market values at that time, but one that is not so high as to make it economically impractical for record producers to invoke the compulsory license if negotiations fail.
 H.R.Rep.No.83, 90th Cong., 1st Sess. 74 (1967).
 
 
 [30]
 The 1976 House report did not discuss the bargaining room theory, but merely alluded to the "extensive review and analysis of the testimony and arguments received" concerning the amount of the royalty rate in the Senate report. 1976 House Report at 111, U.S.Code Cong. & Admin.News at p. 5726. The report cited the 1967 House report earlier in its discussion of the compulsory license, but only for a limited purpose: "The arguments for and against retention of the compulsory license are outlined at pages 66-67 of this Committee's 1967 report (H.Rept.No.83, 90th Cong., 1st Sess.). The Committee's conclusion on this point remains the same as in 1967 ...." Id. at 107, U.S.Code Cong. & Admin.News at p. 5722 (emphasis added). Petitioners' quotations from the 1975 hearings, see Reply Brief of Petitioners AGAC and NSAI, demonstrate that the Register of Copyrights supported the bargaining room theory, and that some members of the House committee questioned the wisdom of the compulsory licensing system, but they shed no light on the decision Congress made in enacting the statute
 
 
 [31]
 See 3 1975 Hearings 1923 (memorandum of Prof. Gellhorn); note 13 and accompanying text supra
 
 
 [32]
 The copyright owners also argue that their cross-examination of industry testimony was unduly impaired by the Tribunal's failure to insist that the data underlying a commissioned economic survey be disclosed. See 46 Fed.Reg. at 10,478. As we have observed, see note 17 and accompanying text supra, the Copyright Act does not require formal hearing procedures before the Tribunal. Petitioners cite as the basis for their argument the Tribunal's procedural regulations, which guarantee a right of cross-examination, and which specify that parties submitting analyses must make available their input data if the Tribunal so requests. 37 C.F.R. § 301.51(h), (1) (1980). While we do not condone RIAA's defiance of the Tribunal's request for data, we see nothing in the regulations that would preclude the Tribunal from withdrawing its request, or that would require the Tribunal to strike a survey from the record because a request for underlying data had been denied. The Tribunal's interpretation of its own regulations is, of course, entitled to deference. See Bowles v. Seminole Rock Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Ashland Exploration, Inc. v. FERC, 631 F.2d 1018 (D.C.Cir.1980), cert. denied, 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981). Since the survey in question was not determinative of the Tribunal's decision, and since it was corroborated by other evidence, we agree that it was sufficient for the Tribunal to view the refusal to submit possibly confidential data as "go(ing) to the weight we should accord their evidence, not to its admissibility." 46 Fed.Reg. at 10,478
 
 
 [33]
 The statute addresses the effective date of Tribunal "determinations" only in a limited context:
 Any final determination by the Tribunal under this chapter shall become effective thirty days following its publication in the Federal Register as provided in section 803(b), unless prior to that time an appeal has been filed pursuant to section 810, to vacate, modify, or correct such determination, and notice of such appeal has been served on all parties who appeared before the Tribunal in the proceeding in question. Where the proceeding involves the distribution of royalty fees under sections 111 or 116, the Tribunal shall, upon the expiration of such thirty-day period, distribute any royalty fees not subject to an appeal filed pursuant to section 810.
 17 U.S.C. § 809 (1976). Section 810 gives an aggrieved party thirty days after the publication of a decision to seek judicial review. Id. § 810. One evident purpose of these provisions is to prevent the determination from becoming effective until the time for judicial review has lapsed. The copyright users argue that even when no appeal is filed, section 809 requires only the determination to become effective after thirty days and not the new royalty rate. Responsive Brief of Petitioners RIAA and CBS at 15. We need not address this question since, obviously, judicial review has been sought in this case.
 
 
 [34]
 See, e. g., Industrial Union Dep't v. Bingham, 570 F.2d 965, 969 (D.C.Cir.1977) (opinion of Leventhal, J.); id. at 979 (opinion of Fahy, J.); Capital Cities Communications, Inc. v. FCC, 554 F.2d 1135, 1139 (D.C.Cir.1976); Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153 (D.C.Cir.1967)
 
 
 [35]
 The statutory provisions requiring prompt initiation and resolution of rate proceedings, see 17 U.S.C. § 804 (1976), do not necessarily reflect a concern that copyright owners receive the instantaneous benefit of a rate increase. The provision giving the Tribunal no more than a year in which to make its determination, id. § 804(e), for example, is explained sufficiently by a desire not to let administrative proceedings become unduly protracted; this time limit was already present in the 1975 Senate bill, which had other provisions automatically postponing the effectiveness of a rate determination for at least 180 days after the Tribunal's decision, see Senate Bill §§ 804(e), 807; 1975 Senate Report at 36-37, 157-58
 
 
 [36]
 See, e. g., 122 Cong.Rec. 2836 (1976) (remarks of Sen. Tunney); id. at 3147 (remarks of Sen. McClellan); id. at 3823 (remarks of Sen. Abourezk)
 
 
 [37]
 The twelve-month time limit for decision could be extended on a showing of good cause, upon the approval of the Judiciary Committees of both houses of Congress. See Senate Bill § 804(e); 1975 Senate Report at 36, 157. Panels were to be convened to decide royalty distribution controversies whenever the Register of Copyrights determined that such a controversy existed. See id. § 803(a); Senate Report at 36
 The periodic review provisions of the Senate bill were not greatly different from those enacted; the House changed the lengths of some of the intervals, staggered the second review dates, and added the provision for cable rate redetermination in response to FCC action. Compare id. §§ 802-804; Senate Report at 36 with 17 U.S.C. § 804 (1976).
 
 
 [38]
 The significance of the expression "to maintain the real fee level" is not entirely clear. Contrary to the implication in NMPA's arguments that inflationary pressure on the purchasing value of the royalty rate is the key, see Answering Brief for Intervenor NMPA at 23-27, the adjustment procedure is not designed to track changes in the purchasing power of the dollar. Rather, royalty payments are increased only to the extent that record manufacturers increase the prices of their products. See 46 Fed.Reg. at 10,486. Maintaining the royalty as a constant fraction of average record prices appears to be more related to guaranteeing copyright owners a fair share of industry revenues than to compensating for erosion of the rate by inflation. This approach is, of course, within the discretion of the Tribunal; we do not suggest that tying the royalty rate to the consumer price index would be more appropriate
 
 
 [39]
 Our inability to defer to the Tribunal on this point of statutory interpretation results from the clarity of the statutory language and the legislative history, the failure of the Tribunal to address the legal point directly, and the irrelevance of the Tribunal's expertise to the legal question of its authority to institute proceedings between the statutory dates. See, e. g., Office of Consumers' Counsel v. FERC, 655 F.2d 1132 at 1141-1142 (D.C.Cir.1980), and cases cited
 
 
 [40]
 The statutory provision requiring the Tribunal to render its final decision within one year from initiation of proceedings, 17 U.S.C. § 804(e) (1976), does not preclude further proceedings on direction of a court exercising judicial review. See Jacksonville Port Authority v. Adams, 556 F.2d 52, 56 (D.C.Cir.1977)