NATIONAL CABLE TELEVISION ASSOCIATION, INC., Petitioner,

v.

COPYRIGHT ROYALTY TRIBUNAL, Respondent,

Peyton Broadcasting, Ltd., Motion Picture Association of America, Inc., Turner Broadcasting Systems, Inc., New York State Commission on Cable Television, National Association of Broadcasters, Broadcast Music, Inc., United Video, Inc., Major League Baseball, et al., American Society of Composers, etc., Southern Satellite Systems, Inc., Longview Cable Television, Co., Inc., Sin, Inc., Allen's TV Cable Service, Inc., et al., Intervenors.

No. 82-2389.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1983.
Decided Dec. 30, 1983.

Robert St. John Roper, Washington, D.C., with whom Brenda L. Fox, Michael S. Schooler, and Stuart F. Feldstein, Washington, D.C., were on the brief, for petitioner. Jay E. Ricks and David J. Saylor, Washington, D.C., also entered appearances for petitioner.

Bruce G. Forrest, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondent.

Arthur Scheiner, Washington, D.C., with whom Dennis Lane, Washington, D.C., for the Motion Picture Ass'n of America, Inc.; Bernard Korman and I. Fred Koenigsberg, New York City, for American Society of Composers, Authors and Publishers; and Charles T. Duncan, Michael W. Faber, and Joel S. Winnik, Washington, D.C., for Broadcast Music, Inc. were on the joint intervenors' brief. Richard H. Waysdorf, Washington, D.C., also entered an appearance for Motion Picture Ass'n of America, Inc., et al.

Charles D. Ferris, Bruce D. Sokler, and L. Gregory Ballard, Washington, D.C., were on the brief for intervenor, Turner Broadcasting System, Inc.

John R. Harder, Albany, N.Y., was on the brief for intervenor, New York State Com'n on Cable Television.

Victor E. Ferrall, Jr., John I. Stewart, Jr., Erwin G. Krasnow, and Michael D. Berg, Washington, D.C., were on the brief for intervenor, National Ass'n of Broadcasters.

Robert F. Corazzini and Peter H. Feinberg, Washington, D.C., were on the brief for intervenor, Southern Satellite Systems, Inc.

John P. Cole, Jr., Robert L. James, David M. Silverman, and James F. Ireland, III, Washington, D.C., were on the brief for intervenors, United Video, Inc., et al.

David H. Lloyd, Robert S. Thorpe, and Robert Alan Garrett for Major League Baseball; Philip R. Hochberg, Washington, D.C., for the National Basketball Ass'n and the North American Soccer League; Robert W. Coll, Washington, D.C., for the National Hockey League; Judith Jurin Semo, Washington, D.C., for the National Collegiate Athletic Ass'n; Charles T. Duncan, Michael W. Faber, and Joel S. Winnik, Washington, D.C., for Broadcast Music, Inc.; Bernard Korman, I. Fred Koenigsberg, New York City, and Benjamin L. Zelenko, Washington, D.C., for American Society of Composers, Authors and Publishers were on the joint intervenors' brief.

Gary Shaver, Asst. City Atty., Longview, Tex., was on the brief for amicus curiae, City of Longview, Texas, urging that the decision should be vacated.

Martin E. Firestone and Neal A. Jackson, Washington, D.C., entered appearances for intervenor, Peyton Broadcasting, Ltd.

Michael S. Horne and Paul J. Berman, Washington, D.C., entered appearances for intervenor, Longview Cable Television, Co., Inc.

Norman P. Leventhal, Barbara K. Kline, and Edwina Dowell, Washington, D.C., entered appearances for intervenor, SIN, Inc.

Robert W. Kastenmeier, Washington, D.C., entered an appearance as amicus curiae as the Chairman of the House Subcommittee on Courts.

Robert S. Golden, Jr., Asst. Atty. Gen., Hartford, Conn., State of Connecticut as amicus curiae for the State of Connecticut.

Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Copyright Act of 1976 (Act or 1976 Act)[1] establishes a compulsory licensing scheme encompassing phonorecords and jukebox performances of musical works, certain noncommercial broadcasting transmissions, and certain cable television retransmissions. 17 U.S.C. §§ 111, 115, 116, 118 (1982). To superintend the scheme, Congress created the Copyright Royalty Tribunal (Tribunal or CRT). Id. §§ 801–810. The Tribunal is empowered to adjust royalty rates and to allocate among copyright owners royalty fees collected from copyright users. Id. §§ 111(d), 116(c), 118(b), 801(b). This petition for review concerns the Tribunal's order adjusting the compulsory licensing rates for cable television operators in response to certain Federal Communications Commission (FCC) deregulatory measures. See Adjustment of the Royalty Rate for Cable Systems; Fed-eral Communications Commission's Deregulation of the Cable Industry, 47 Fed.Reg. 52146 (Nov. 19, 1982), reprinted in Joint Appendix (J.A.) 11–24 (CRT Decision).

Petitioner National Cable Television Association, Inc. (NCTA) and several intervenors seek reversal of the CRT's final decision. Our examination of the record and consideration of the arguments tendered persuade us that the Tribunal has not abused its broad discretion to adjust rates. Because we conclude that the CRT has made adjustments we cannot characterize as unreasonable, and has adequately explained them, we affirm its decision in all respects.

I. BACKGROUND

A principal use of cable technology, since its inception, has been the retransmission of broadcast signals to areas beyond the reach of conventional "over the air" facilities. The Copyright Act of 1909, as construed by the Supreme Court, made no provision for cable operators' copyright liability. See Teleprompter Corp. v. CBS, Inc., 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). In the 1976 Act, however, Congress expressly imposed such liability. 17 U.S.C. § 111. Individual marketplace negotiations between copyright owners and users, Congress believed, would entail inordinately high transaction costs. See HOUSE JUDICIARY COMMITTEE, COPYRIGHT LAW REVISION, H.R.REP. No. 1476, 94th Cong., 2d Sess. 89 (1976) (House Report), U.S.Code Cong. & Admin.News 1976, 5659. Congress therefore licensed cable operators to carry whatever television programming FCC rules permitted; in exchange for this permission, however, Congress required cable operators to pay royalties for carriage of distant broadcast stations' nonnetwork programming.[2] 17 U.S.C. § 111(c)(1),

---

1. Pub.L. 94–553, § 101, 90 Stat. 2541 (1976) (codified at 17 U.S.C. §§ 101–810 (1982)).

2. The House Report explains why no fees were imposed for cable carriage of network and local nonnetwork programming:

The Committee determined ... that there was no evidence that the retransmission of

(d)(2). These compulsory license fees, paid by cable operators to the Copyright Office, are distributed to copyright owners by the Tribunal. *Id.* §§ 111(d)(3)–(5), 801(b)(3).

The 1976 Act sets initial fee schedules for cable carriage of distant broadcast signals, 17 U.S.C. § 111(d)(2)(B), (C), (D), and authorizes the CRT to make periodic adjustments to account for inflation and changes in the rates cable systems charge their subscribers. *Id.* §§ 801(b)(2)(A), (D); 804(a). In addition, Congress authorized the Tribunal to adjust rates, in accordance with a reasonableness standard, in the event of changes in FCC rules regulating cable—specifically, alteration of the FCC's restrictive distant signal and syndicated program exclusivity rules. *Id.* § 801(b)(2)(B), (C).[3] The authority accorded the CRT regarding FCC distant signal rule changes is limited, however. The Tribunal may not, in response to such FCC action, adjust rates for signals cable operators could carry under FCC rules in effect on April 15, 1976. The CRT is empowered to adjust rates only as to *newly added signals, i.e.,* those carried for the first time after change in the FCC's distant signal rules. *Id.* § 801(b)(2)(B); *see also* House Report, *supra,* at 176.

The FCC's distant signal and syndicated program exclusivity rules were promulgated in 1972. *Cable Television Report and Order,* 36 FCC2d 143 (1972). The distant signal rules restricted the number of distant broadcast signals a cable system was permitted to carry; the limit varied according to the size and signal density of the market within which the cable system operated.[4] The syndicated program exclusivity rules limited cable carriage of particular programs otherwise permitted under the FCC's distant signal quotas; program producers and local broadcasters who had purchased exclusive rights to particular programming could demand that a local cable operator delete that programming from its distant signals.[5] These FCC rules "were fashioned in the context of a continuing policy debate as to whether cable operators should face copyright liability for the programs they retransmitted to subscribers." *Malrite T.V. v. FCC,* 652 F.2d 1140, 1145 (2d Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). In 1976, when Con-

---

"local" broadcast signals by a cable operator threatens the existing market for copyright program owners. Similarly, the retransmission of network programming, including network programming which is broadcast in "distant" markets, does not injure the copyright owner. The copyright owner contracts with the network on the basis of his programming reaching all markets served by the network and is compensated accordingly.
House Report, *supra,* at 90, U.S.Code Cong. & Admin.News 1976, at 5704, *see also National Cable Television Association v. CRT,* 689 F.2d 1077, 1079 (D.C.Cir.1982).

**3.** These rules are described *infra* notes 4 & 5 and accompanying text. Section 801(b)(2)(C) also permits the Tribunal to adjust cable royalty rates in response to changes in the FCC's sports program exclusivity rules.

**4.** In the top 50 television markets, cable systems were permitted to carry three network stations and three independents; in the second 50 markets, three networks and two independents; in the smaller markets, three networks and one independent. Two "bonus" independent signals were permitted in major markets where local signals filled the allotted cable complement. *Malrite T.V. v. FCC,* 652 F.2d

1140, 1144–45 (2d Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

**5.** The Second Circuit in *Malrite T.V.* described the operation of the syndicated exclusivity rules:

[I]n the top 50 markets, at the request of a local station, cable operators must delete all syndicated programs under exclusive exhibition contract to the requesting station, regardless of when the program is scheduled for showing on the local station, and program copyright owners can request deletion for one year after the first syndicated sale of the program, even if no local station has the rights to exhibit it. In the second 50 markets, distant syndicated programs need not be deleted if broadcast in prime time unless the requesting local station is also planning to air the program in prime time, and exclusivity rights expire at specified time periods or on the occurrence of specified events, depending on the nature of the program, *.e.g,* first-run syndicated series and feature films are protected for two years while reruns of network series are protected for only one year. Only systems in the top 100 markets are subject to these rules.

*Id.* at 1145 n. 5.

gress determined to create a form of copyright liability for cable operators, the FCC "commenced an inquiry into the need for maintaining its copyright surrogates, the distant signal and syndicated exclusivity rules." *Id.* at 1146 (citations omitted). In 1980, the FCC repealed both sets of rules.

In response to the FCC's action, NCTA as well as representatives of copyright owners[6] petitioned the Tribunal to commence a rate adjustment proceeding. *See* 17 U.S.C. § 804(b). In that proceeding, the CRT determined that cable systems must pay 3.75% of their gross receipts from basic services for each "distant signal equivalent" added as a result of the FCC's deregulation.[7] Further, the Tribunal adjusted the then current distant signal fee scale to compensate copyright owners for the FCC's repeal of syndicated program exclusivity protection. In this review proceeding, NCTA and supporting intervenors ask us to vacate the CRT's decision.

## II. REVIEW PERSPECTIVE

As indicated in the 1976 Copyright Act, *see* 17 U.S.C. § 810, we apply to the CRT's rate adjustment proceedings the Administrative Procedure Act's heavily-worked review standard authorizing courts to "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982); *see Recording Industry Association of America v. CRT,* 662 F.2d 1, 7–9 (D.C.Cir.1981) *(RIAA); Amusement and Music Operators Association v. CRT,* 676 F.2d 1144, 1149–52 (7th Cir.) *(AMOA), cert. denied,* 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982); *see also National Association of Broadcasters v. CRT,* 675 F.2d 367, 375 n. 8 (D.C.Cir.1982) *(NAB).* Judicial review, whenever the "ar-

bitrary, capricious, abuse of discretion" touchstone is employed, should be "searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In all cases, we attempt to assure ourselves that the agency has fairly attended to prescribed procedures. The tautness of court surveillance of the rationality of agency decisionmaking, however, depends on the nature of the task assigned to the agency. If Congress sets precise guidelines for agency action, courts must tightly review the agency's directives to determine whether the congressional instructions have been observed. On the other hand, if Congress entrusts a novel mission to an agency and specifies only grandly general guides for the agency's implementation of legislative policy, judicial review must be correspondingly relaxed. *Cf. ITT World Communications, Inc. v. FCC,* 699 F.2d 1219, 1245 (D.C. Cir.1983) ("arbitrary and capricious standard ... requires calibration in accordance with the nature and context of the challenged action"), *cert. granted,* —— U.S. ——, 104 S.Ct. 334, 78 L.Ed.2d 304 (1983); *Cape May Greene, Inc. v. Warren,* 698 F.2d 179, 190 (3d Cir.1983) ("stringency of [review under the arbitrary and capricious standard] will depend on, and often vary according to, the variety of factors presented by a particular case"); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1050 (D.C.Cir.1979) ("concept of 'arbitrary and capricious' review defies generalized application and demands, instead, close attention to the nature of the particular problem faced by the agency") (footnote omitted).

The functions Congress has assigned to the Tribunal require us to accord a large measure of deference to its substantive rul-

---

**6.** The American Society of Composers, Authors and Publishers (ASCAP), and the Motion Picture Association of America (MPAA).

**7.** "[D]istant signal equivalent" is defined in 17 U.S.C. § 111(f). In essence, that section provides that each distant independent station's signal counts as one distant signal equivalent (DSE), and the nonnetwork programming of each network station and each noncommercial

educational station counts as one-quarter of a DSE. In general, a broadcast signal is "distant" if retransmitted by a cable system located more than 100 miles from the signal's point of origin. *See National Ass'n of Broadcasters v. CRT,* 675 F.2d 367, 373 n. 3 (D.C.Cir.1982) (citing 122 Cong.Rec. 32,010 (1976) (remarks of Rep. Danielson)).

ings. Congress placed the CRT "in the legislative branch," 17 U.S.C. § 801(a); it charged the Tribunal with responsibility for decisions of a judgmental or predictive character, and it anticipated that the CRT's members would resort to their expert comprehension of copyright policy to equitably reconcile interests pointing in opposing directions. See RIAA, 662 F.2d at 8–9. As to additional television broadcast signals available to cable operators as a result of the FCC's deregulation decision, Congress authorized the Tribunal to determine "reasonable" rates taking into account, "among other factors, the economic impact on copyright owners and users." 17 U.S.C. § 801(b)(2)(B). The "other factors" are not enumerated, nor did Congress supply any further instruction. As to the FCC's elimination of its syndicated program exclusivity rules, Congress said even less; it simply authorized the Tribunal to effect a "reasonable" adjustment of the royalty rates. Id. § 801(b)(2)(C). In short, the Tribunal, in the proceeding before us for review, was called upon to make essentially legislative judgments "with very little substantive guidance from Congress." Christian Broadcasting Network, Inc. v. CRT, 720 F.2d 1295 at 1303 (D.C.Cir.1983) (CBN) (statement made in reviewing Tribunal's cable royalty distribution).

■ Ratemaking generally "is an intensely practical affair." Trans World Airlines, Inc. v. CAB, 385 F.2d 648, 658 (D.C. Cir.1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). The Tribunal's work particularly, in both ratemaking and royalty distribution, necessarily involves estimates and approximations. There has never been any pretense that the CRT's rulings rest on precise mathematical calculations; it suffices that they lie within a "zone of reasonableness." See CBN, at 1304; NAB, 675 F.2d at 374; RIAA, 662 F.2d at 9 (all citing, inter alia, Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968)).

The Tribunal confronts the arduous task of "simulating the subtleties of the cable marketplace within a one-year decisionmaking period." CBN, at 1319. Moreover, unlike most administrative agencies, the CRT functions without benefit of legal assistants to embellish or elaborate the Commissioners' decisions. See National Cable Television Association v. CRT, 689 F.2d 1077, 1087 n. 74 (D.C.Cir.1982) (NCTA). Thus, we do not expect "ideal clarity" from the Tribunal, see RIAA, 662 F.2d at 14, and will not disturb its decisions simply because their composition is less than elegant. See CBN, at 1304.

■ In sum, Congress vested in the Tribunal legislative discretion greater than that committed to regulatory agencies engaged in cost of service rate making. See RIAA, 662 F.2d at 8–9. We must recognize the judgmental expertise of the Tribunal's members regarding copyright policy, id. at 8, and demand only an accounting adequate to assure us that the rates we review are not lacking in rationality.

## III. THE TRIBUNAL'S RATE DETERMINATIONS

We consider separately, and measure against a rationality standard, the two rate adjustments the Tribunal made to reflect the FCC's repeal of its distant signal and syndicated program exclusivity rules.

### A. Distant Signal Carriage Fees

Congress established, in the 1976 Copyright Act, initial schedules of fees to be paid by cable operators in exchange for the right to carry nonnetwork programming from distant broadcast stations. 17 U.S.C. § 111(d)(2)(B), (C), (D). As prescribed in the Act, larger cable systems were to pay 0.675% of their gross receipts from basic services for the first distant signal equivalent (DSE) carried, 0.425% for the second, third, and fourth DSE's, and 0.2% for the fifth and each additional DSE.[8] Id. § 111(d)(2)(B). The Act provided for automatic CRT review of the statutory cable

---

8. In fact, the initial charge, 0.675% of gross receipts from basic services, had to be paid just for the license to carry distant broadcast signals, but that amount could be applied against royalties owed for actual carriage of distant signals. 17 U.S.C. § 111(d)(2)(B).

royalty rates in 1980 and authorizes, at the request of a party in interest, royalty adjustment proceedings every five years thereafter. *Id.* §§ 801(b)(2)(A), 804(a). In its first adjustment proceeding, the Tribunal raised the statutory rates by 21% to reflect inflation and changes in cable subscription fees. *1980 Adjustment of the Royalty Rate for Cable Systems,* 46 Fed. Reg. 892 (1981), *aff'd in substantial part, NCTA, supra.* The statutory schedule, as thus adjusted upward, applied to all distant signals, including those freed up by the FCC's deregulation, at the time the CRT initiated the instant proceeding.

### 1. *Tribunal Decision*

■ In determining the appropriate rate adjustment for deregulated distant signals, the Tribunal proceeded from the premise that Congress had not intended the statutory fee schedule to have precedential effect in proceedings to set reasonable rates for newly "freed up" distant signals.[9] *CRT*

*Decision,* 47 Fed.Reg. at 52152; J.A. 17.[10] The CRT set as its task estimation of a market fee—that is, the fee for the deregulated signals that program producers and cable operators would have agreed upon in the absence of compulsory licensing and the presence of copyright liability. *See, e.g., CRT Decision,* 47 Fed.Reg. at 52153; J.A. 18 ("We do not find in the compulsory license, as it exists today, any public policy justification for establishing royalty rates below reasonable marketplace expectations of the copyright owners.").

Both NCTA and the copyright owners presented evidence aimed at approximating that market rate. NCTA's principal witness, Dr. Park, devised an economic model using hypothetical supply and demand curves. *See* J.A. 185–92 (NCTA Proposed Findings of Fact Nos. 106–20); J.A. 1319–90 (Park testimony). His model generated a schedule of royalty rates not very different from the one then in effect. *CRT Decision,* 47 Fed.Reg. 52154; J.A. 19. The CRT

---

**9.** The Tribunal also refused to adopt the findings and conclusions made in the FCC's 1980 order repealing the distant signal and syndicated exclusivity rules. *CRT Decision,* 47 Fed. Reg. at 52152; J.A. 17. NCTA and intervenors cite this refusal as a fatal flaw. *See* Brief of National Cable Television Association, Inc. (NCTA Brief) at 46; Brief for Intervenor Southern Satellite Systems, Inc. (Southern Satellite Brief) at 23–24 & n. 31; Brief of Intervenor Turner Broadcasting System, Inc. (Turner Brief) at 24–32. We disagree. "[A] court should approach gingerly a claim that one agency has conclusively determined an issue later analyzed from another perspective by an agency with different substantive jurisdiction." *FTC v. Texaco, Inc.,* 555 F.2d 862, 881 (D.C. Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); *see also Teleprompter Corp. v. CBS, Inc.,* 415 U.S. 394, 406 n. 11, 94 S.Ct. 1129, 1137 n. 11, 39 L.Ed.2d 415 (1974) ("The FCC has consistently contended that it is without power to alter rights emanating from other sources, including the Copyright Act.").

The legislative history of the 1976 Act supports the Tribunal's position and is at odds with the opposing view. *See* 122 Cong.Rec. 31984 (1976) (statement of Congressman Railsback) ("[T]he Federal Communications Commission and the Copyright Royalty [Tribunal] are two entirely separate commissions with entirely separate jurisdiction, proceedings, and functions."). We note in addition that the evi-

dence before the FCC was outdated when the CRT rulemaking commenced. Finally, it is at least an exaggeration to assert that the two agencies' resolutions of the same factual questions were "totally inconsistent." *See* Turner Brief at 26. At several points in its 4–3 cable deregulation decision, the FCC noted that the Tribunal could adjust royalty fees to compensate copyright owners for any adverse consequences of cable deregulation. 1980 Order Deleting Cable Television Distant Signal and Syndicated Exclusivity Rules, 79 FCC2d 663, 760, 763, 769–70.

**10.** NCTA and intervenors supporting its petition fault the Tribunal for citing a post-enactment statement by one of the drafters of the 1976 Act that Congress "did not contemplate the complete elimination [of the FCC's] regulations on distant signal carriage and syndicated program exclusivity." *CRT Decision,* 47 Fed. Reg. at 52152; J.A. 17. *See* NCTA Brief at 31 n. 81; Reply Brief of National Cable Television Association, Inc. (NCTA Reply Brief) at 17–18 & nn. 43 & 44; Southern Satellite Brief at 17–20. Post-enactment statements merit little weight, but there is no indication here that the statement cited is inconsistent with the language of the statute or departs from the legislature's pre-enactment understanding. We therefore regard the reference as harmless. *Cf. American Fed'n of Gov't Employees v. Federal Labor Relations Auth.,* 712 F.2d 640 at 647 n. 29 (D.C.Cir.1983).

found NCTA's presentation useless; it pointed out that Dr. Park's study rested upon data "from a period in which the carriage of distant signals was significantly different from what it is today," "contained acknowledged errors," and employed "intuition" not readily susceptible to evaluation. *Id.*

While NCTA's econometric study analyzed projected transactions, the copyright owners' presentation relied on actual marketplace events. They proposed that the Tribunal consider programming prices in analogous markets to guide its determination of fees for newly deregulated distant signals; the proffered analogies were the television broadcast and sports network markets. The CRT noted two important differences between these markets and the distant signal one. *Id.* First, broadcasters, unlike cable operators, rely upon advertising revenues. Second, broadcasters control their programming; cable operators may select entire broadcast signals, but they cannot control the content of particular programs.

The Tribunal recognized that the analogies presented by the copyright owners were far from perfect. *Id.* Nonetheless, the CRT found the copyright owners' analogies "much more helpful" than Dr. Park's economic model. *Id.* In the absence of other, more useful, evidence, the Tribunal "looked for its initial guidance to the marketplace analogies presented by the copyright owners and to the value [of] programming ... derived from them." *Id.* at 52155; J.A. 20. "Then, on the basis of its judgment and the record as a whole," the CRT made a downward adjustment from the 5% rate for additional signals sought by the copyright owners. *Id.* "The Tribunal concluded that a fair and reasonable rate for each additional distant signal is 3.75%." *Id.*[11]

### 2. *Analysis*

NCTA complains that the Tribunal, in effect, has restored the barrier once imposed by the FCC on the carriage of more than a limited number of distant signals. The rate set by the Tribunal far exceeds the value of additional signals to cable operators, NCTA asserts; NCTA therefore predicts that the signals freed up by the FCC's 1980 deregulation will not be carried. *See* Brief of National Cable Television Association, Inc. (NCTA Brief) at 27, 33, 45–48. NCTA argues that the CRT should have adhered closely to the statutory fee schedule, which sets modest, declining rates; NCTA assails the Tribunal's flat 3.75% solution as bereft of evidentiary support. *See id.* at 27–28, 33–38. We conclude that neither the 1976 Copyright Act nor its legislative history required the Tribunal to base its additional distant signal adjustment on the statutory declining rate schedule. Further, we find that the CRT, in view of the record and the essentially legislative character of the decision Congress charged it to make, acted on the best evidence its resources permitted it to garner.[12]

The Act itself, as earlier observed, simply directs the Tribunal "to insure that the rates for the additional distant signal equivalents ... are reasonable," and to consider in the balance "the economic impact on copyright owners and users." 17 U.S.C.

---

11. It bears emphasis that the 3.75% rate applies only to newly added distant signals. Signals cable operators were permitted to carry under the FCC's former distant signal rules are unaffected by the Tribunal's rate adjustment. *See supra* p. 181. For the typical system, the carriage of four distant signals will continue to be governed by the statutory schedule, as adjusted for inflation and changes in cable subscription fees. *See* Joint Sports Exhibit 3A, *reprinted in* J.A. 1914 (statistical profile of larger cable systems before CRT rate adjustment proceeding at hand took place).

12. In creating a Copyright Royalty Tribunal, Congress

> expected that [its] staff [would] consist only of sufficient clerical personnel to provide one full time secretary for each member and one or two additional employees to meet the clerical needs of the entire [Tribunal]. Members of the [Tribunal were] expected to perform all professional responsibilities themselves, except where it [was] necessary to employ outside experts on a consulting basis.

House Report, *supra,* at 174; *see also supra* p. 182.

§ 801(b)(2)(B).[13] The legislative history, the CRT concluded, demonstrates that the fee schedule set forth in the Act reflected a political compromise, not an effort to arrive at "reasonable" rates, and was not intended to bind the Tribunal in the proceeding at hand. *Cf. AMOA,* 676 F.2d at 1146, 1152–54 (statutory royalty fee for jukebox operators was a compromise not entitled to significant precedential value in rate adjustment proceeding). We agree.

Compelling support for the Tribunal's position appears in the committee reports. The Senate Report states:

> With respect to the adjustment of the statutory royalty rates . . ., the purpose of the Tribunal is "to assure that such rates are reasonable." The committee in fixing the royalty rates has had to weigh various considerations, such as the circumstance that certain users will be paying copyright royalties for the first time. While these considerations influenced the committee's determination on rates *it in no way restricts the independence of the Tribunal to recommend adjustment of these rates to assure that the rates are "reasonable" according to whatever criteria the Tribunal deems appropriate. The committee does not intend that the rates in this legislation shall be regarded as precedents in future proceedings of the Tribunal.*

Senate Judiciary Committee, Copyright Law Revision, S.Rep. No. 473, 94th Cong., 1st Sess. 155 (1975) (emphasis added). Focusing on the prospect of FCC alteration of its rules governing cable carriage of distant signals, the House Report observes that it was the purpose of 17 U.S.C. § 801(b)(2)(B)

to give the [Tribunal] *broad discretion to reconsider the royalty rates* applicable to (but only to) the carriage of any additional distant signals permitted under the rules and regulations of the FCC after April 15, 1976.

House Report, *supra,* at 176, U.S.Code Cong. & Admin.News 1976, at 5792 (emphasis added). We further note that an earlier version of the 1976 Act had empowered the Tribunal to adjust cable rates to ensure that they *"continue* to be reasonable." S.1361, 93d Cong., 1st Sess. § 801(b) (1973) (emphasis added). Apparently, the "continue to be" language was deleted at the insistence of copyright owners who argued Congress had made no initial finding of reasonableness. *See Copyright Law Revision: Hearings on S.1361 Before the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Judiciary Comm.,* 93d Cong., 1st Sess. 283, 302 (1973).

■ Nor can we credit NCTA's belated argument that, even if Congress did not require the Tribunal to use the statutory fee schedule as its initial guide, the CRT erred in employing a market value approach to "reasonable" rate setting. *See* Reply Brief of National Cable Television Association, Inc. (NCTA Reply Brief) at 15–16. All of the parties before the Tribunal favored a market price approach, *i.e.,* estimation of the rate copyright owners and users would agree upon in the absence of compulsory licensing and the presence of copyright liability.[14] In rejecting NCTA's tardily pressed contention, it suffices to point to our recent decision upholding the Tribunal's effort to set a market price as "more than reasonable" in light of "Con-

---

**13.** Section 801(b)(2)(B) provides, in substantial part:

> In the event that the rules and regulations of the Federal Communications Commission are amended at any time after April 15, 1976, to permit the carriage by cable systems of additional television broadcast signals beyond the local service area of the primary transmitters of such signals, the royalty rates established by section 111(d)(2)(B) may be adjusted to insure that the rates for the additional distant signal equivalents resulting from such carriage are reasonable in the light of the changes effected by the amendment to

such rules and regulations. In determining the reasonableness of rates proposed following an amendment of Federal Communications Commission rules and regulations, the Copyright Royalty Tribunal shall consider, among other factors, the economic impact on copyright owners and users. . . .

17 U.S.C. § 801(b)(2)(B).

**14.** *See, e.g.,* J.A. 1297–98 (testimony of NCTA's principal witness, Dr. Park, supporting a marketplace standard as in accord with the intent of Congress).

gress' evident intent to have the Tribunal operate as a substitute for direct negotiations (which were thought to be unpractical) among cable operators and copyright owners." *CBN,* at 1306; *see also AMOA, supra* (affirming CRT decision to set market rate for jukebox royalties despite absence of explicit statutory instruction).[15]

NCTA argues most vigorously that the television broadcast and sports network markets accepted by the Tribunal as its initial guide were acknowledged to be "dissimilar," indeed, "incomparable"; therefore, NCTA charges, it was capricious for the CRT to use them as reference points in determining a reasonable fee for deregulated distant signals. *See* NCTA Brief at 35–37; NCTA Reply Brief at 9. The Tribunal recognized the limitations of the analogies the copyright owners tendered. But it had no more helpful evidence to consider. NCTA's own presentation, for the reasons stated by the Tribunal, *see supra* pp. 183–184, was no aid at all in the CRT's effort to approximate a market price. Under the circumstances, we cannot fault the Tribunal for using, as references to which it would

apply its expert judgment, the owners' studies of analogous marketplaces.

■ Despite the substantial distinguishing features, the copyright owners' studies constituted the "most attractive" evidence available to the Tribunal. *See AMOA,* 676 F.2d at 1156–57. We adhere to our precedent accepting comparison of dissimilar items when the expert agency exercises its discretion to "provid[e] adjustments for the areas of difference." *Trans World Airlines, Inc. v. CAB,* 385 F.2d at 658.

■ NCTA objects that the CRT failed to explain how it exercised its discretion in arriving, ultimately, at the 3.75% flat rate. *See* NCTA brief at 36–37.[16] The Tribunal, it is true, was laconic. It said as to its quantification only this: it used the proffered market analogies for what they were worth and "[t]hen, on the basis of its judgment and the record as a whole, . . . made a downward adjustment for what it consider[ed] the difference between these marketplaces and the marketplace for distant signals." *CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20.

**15.** NCTA argues that "[o]ne of the [Tribunal's] most egregious errors" was its failure to place upon the copyright owners the burden of proving that royalty fees should be increased. NCTA Brief at 43–45. The Seventh Circuit rejected similar argument in *AMOA,* 676 F.2d at 1152–54, and we agree with that court's position. We have already held that the CRT reasonably determined that Congress did not intend the statutory royalty rates to bind the Tribunal in future rate adjustment proceedings. *See supra* p. 185. Absent a presumption that the statutory rates were reasonable, it was not inappropriate for the CRT to refuse to place the burden of proving reasonableness on either party. Especially in light of the significant changes in the cable industry worked by the FCC's 1980 deregulation, the Tribunal's position on burden of proof was eminently sensible. *See* Brief for the Copyright Royalty Tribunal (CRT Brief) at 30, 55.

**16.** NCTA also challenges "[t]he Tribunal's inexplicable and irrational failure to factor declining marginal values into [its distant signal] rate adjustments." NCTA Brief at 38; *see also* NCTA Reply Brief at 20–24; Southern Satellite Brief at 20–21. The CRT's principal explanation for setting a flat fee was that "the much larger issues rendered moot the issue of whether or not additional distant signals decline in

value." *CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20 (footnote omitted). While this explanation is cryptic, we do not find the Tribunal's choice "inexplicable." *Cf. CBN,* at 1307 (refusing to reverse Tribunal on particular point simply because "inartful[ly]" handled).

Nothing in the language or legislative history of the 1976 Act suggests that the declining rate structure was intended to be any more binding on the CRT than the particular rates chosen by Congress. *See supra* pp. 185–86. Nor can we say the Tribunal was unreasonable to reject the declining rate concept for freed-up distant signals in light of the evidence before it. Record evidence suggests that cable systems pay a flat fee for programming purchased on the market. *See* J.A. 964–65. Indeed, NCTA's own principal witness, Dr. Park, instructed the CRT that products sold on the market generally command a fixed price per item. *See* J.A. 1314–17. We have held that the Tribunal acted within its discretion in setting a market rate for cable carriage of newly available distant signals, *see supra* pp. 185–86; it would be anomalous for us now to compel the CRT's adherence to a declining rate concept that the evidence indicates does not figure in market transactions.

In essence, it appears that the Tribunal attempted to "split the difference." We have upheld similar exercises of the CRT's expert judgment before. In *RIAA,* for example, copyright users challenged an increase in the royalty rate on phonorecord production and distribution from 2¾ cents to 4 cents; they objected to the Tribunal's "fail[ure] to give a sufficient derivation of the four-cent figure." *RIAA,* 662 F.2d at 10. We could not say the new rate fell outside a "zone of reasonableness," and therefore allowed the rate to stand. *Id.* at 11; *see also CBN,* at 1304; *NAB,* 675 F.2d at 374 (both stating that CRT percentage royalty allocations are to be affirmed if within a "zone of reasonableness"). We also recall this court's statement in a situation bearing some resemblance to the one we now face:

> It would, of course, be the *summum bonum* if we had accurate figures as to recent costs of carrying special fourth class mail. The only available figures were inaccurate, but were susceptible to rough adjustment. The Postal Service proposed one method of adjustment; the Chief Examiner, another. The Commission regarded each as helpful, but not wholly reliable. *So the Commission more or less split the difference.* No doubt it would have been possible to straighten out some of the errors or supposed errors of adjustment in either the Postal Service's or the Chief Examiner's calculations. And if rate-making were an exact science such a counsel of perfection would be mandatory. But, though courts hesitate so to admit, they know that in the rate-making area, John Selden was prophetic in declaring that in governing it is

not juggling, but too much juggling[,] that is to be blamed.

*Association of American Publishers, Inc. v. Governors of United States Postal Service,* 485 F.2d 768, 773 (D.C.Cir.1973) (emphasis added).

 In sum, the Tribunal sought to estimate a market price in the absence of a functioning market. It used the best, indeed, the only, analogies available to it. It could not mathematically derive its ultimate decision. Inevitably, it used its expert judgment to make a "best guess"; we are not positioned to offer a better one. We decline to label the Tribunal's determination lawless or the product of caprice in view of the nature of the task Congress committed to it, the character of the evidence presented in the rulemaking, and the CRT's lack of resources to engage in independent investigation.

### B. *Syndicated Program Exclusivity Fees*

Congress authorized the Tribunal in the 1976 Copyright Act to adjust cable royalty rates in the event of changes in the FCC's syndicated program exclusivity rules. 17 U.S.C. § 801(b)(2)(C).[17] Those rules allowed local broadcasters and copyright holders to require cable systems to delete syndicated programming from imported signals if the local station had purchased exclusive rights to the programming.[18] "[T]o compensate the copyright owners for [the loss of] blackout protection" resulting from the FCC's 1980 repeal of its syndicated exclusivity rules, the Tribunal, in the instant proceeding, increased the royalty fees for cable carriage of distant signals permitted under the FCC's 1972 rules.[19]

---

**17.** Section 801(b)(2)(C) provides, in substantial part:

> In the event of any change in the rules and regulations of the Federal Communications Commission with respect to syndicated . . . program exclusivity after April 15, 1976, the rates established by section 111(d)(2)(B) may be adjusted to assure that such rates are reasonable in light of changes to such rules and regulations. . . .

17 U.S.C. § 801(b)(2)(C).

**18.** *See supra* note 5 and accompanying text.

**19.** Prior to the instant rate adjustment proceeding, cable operators carrying distant signals that were subject to the FCC's syndicated exclusivity rules paid 0.799% of gross receipts from basic services for the first DSE carried, 0.503% for the second, third, and fourth DSE's, and 0.237% for the fifth and each additional DSE. 37 C.F.R. § 308.2(a) (1983). The rate adjustments devised by the CRT to reflect the repeal of syndicated exclusivity protection require cable operators to pay the following additional percentages of gross receipts from basic services for carriage of "old" distant signals:

*CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20.

### 1. *Tribunal Decision*

In determining a "reasonable" fee to compensate copyright owners for the loss of syndicated exclusivity protection, *see* 17 U.S.C. § 801(b)(2)(C), the Tribunal pursued a "harm/benefit" analysis. *CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20. It found of marginal or de minimis importance benefits that cable operators were purported to receive from the repeal of syndicated exclusivity protection. *Id.*[20] But it credited evidence that distant signal importation by cable diverted audiences from local broadcast stations that had purchased exclusive community rights to syndicated programming; diminished audiences meant lower advertising revenues which translated into reduced bids for programming. *See id.* at 52155–56, 52157; J.A. 20–21, 22. The CRT also agreed in principle with the copyright owners' position that they should be accorded some compensation to reflect the increased subscription fees charged by cable operators as a result of the repeal of syndicated exclusivity protection. *Id.* at 52155; J.A. 20. The Tribunal rejected NCTA's assertion, made in opposition to a fee increase, that distant signal audiences generate additional advertising revenue for broadcast stations whose signals are retransmitted by cable. *Id.* at 52156; J.A. 21.

Based primarily on its conclusion that copyright owners were economically harmed by the programming duplication oc-casioned by cable importation of distant signals, the Tribunal ordered an upward adjustment in the royalty schedule for "old" distant signals to reflect repeal of syndicated exclusivity protection. Again, it found NCTA's evidence—in particular, Dr. Park's testimony—useless because it rested on "highly tentative" assumptions, "ignored the realities of the marketplace, made no provision for emerging technological advances, compounded the confusion of the audience diversion study[,] and understated if not totally ignored the differences between distant signal carriage during the early 70's and 1980." *Id.* at 52157; J.A. 22 (footnotes omitted). The CRT closely reviewed the copyright owners' evidence, found it persuasive in establishing that the right to delete duplicative programming has some value, but considered it exaggerated in measuring precisely what that value is. Accordingly, the Tribunal revised downward the rate elevation requested by the copyright owners. *Id.* at 52158; J.A. 23.

### 2. *Analysis*

What we have said in addressing NCTA's challenge to the CRT's fee determination for newly available distant signals goes far toward answering NCTA's contentions regarding the syndicated exclusivity portion of the Tribunal's decision. Here too, NCTA urges that evidentiary support is lacking for the CRT's determination, and that the Tribunal, lacking a secure basis for any precise calculation, acted capriciously in re-

(1) For cable systems located wholly or in part within a top 50 television market[;]
 (i) .599 per centum of such gross for the first distant signal equivalent;
 (ii) .377 per centum of such gross receipts for each of the second, third, and fourth distant signal equivalents;
 (iii) .178 of 1 per centum for the fifth distant signal equivalent and each additional distant signal equivalent thereafter;
(2) For cable systems located wholly or in part within a second 50 television market;
 (i) .300 per centum of such gross receipts for the first distant signal equivalent;
 (ii) .189 of 1 per centum of such gross receipts for each of the second, third, and fourth distant signal equivalents; and

 (iii) .089 of 1 per centum for the fifth distant signal equivalent and each additional distant signal equivalent thereafter....
*CRT Decision,* 47 Fed.Reg. at 52159; J.A. 24 (codified at 37 C.F.R. § 308.2(d) (1983)).

**20.** These "alleged benefits" included: elimination of subscriber confusion and resentment by reason of blackouts; enabling systems to promote their schedules with certainty and confidence; avoiding the expense of alternative stand-by delivery systems; and the privilege of piggy-backing on the promotional efforts of broadcasters.
*CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20 (footnote omitted).

lying, ultimately, on its judgment. *See* NCTA Brief at 38–43.

 Our review of the record satisfies us that substantial evidence supports the Tribunal's findings that cable importation of distant broadcast signals harms local purchasers of syndicated programming, and that television broadcasters are not compensated by advertisers for the additional distant audiences generated by cable retransmissions. *See, e.g.,* J.A. 753, 762, 766, 777–79 (testimony that Oklahoma television station lost substantial portion of audience to cable systems importing identical programming); J.A. 932–34, 1788, 1789 (evidence and testimony that no superstations, other than perhaps Turner Broadcasting, receive additional advertising revenues due to distant audiences generated by cable retransmissions); J.A. 1012–14, 1030–31 (testimony that additional distant signal audience created by cable is too small to meet minimum criteria of Nielsen ratings which determine advertising prices); J.A. 1107–10 (testimony that local stations often refuse to bid altogether or are only willing to pay lower prices for syndicated programming due to fear of cable importation); J.A. 1111–12, 1115–16 (testimony that even when Turner superstation pays higher programming prices, they are not high enough to compensate syndicated programmers for lower prices local broadcasters are willing to pay due to cable importation).[21]

 As to NCTA's contention that the Tribunal acted arbitrarily in resting its final determination on its "judgment," *see* NCTA Brief at 42 (quoting *CRT Decision,* 47 Fed.Reg. at 52155; J.A. 20), we refer back to our discussion of this objection in the context of the CRT's additional distant signal carriage rate adjustment.[22] We review the Tribunal's rate determinations only to ensure they do not fall outside a "zone of reasonableness." The record here provides the requisite assurance. Given the nature of the task Congress assigned to the CRT, and the dearth of substantive guidance provided by the 1976 Act, we are unwilling to engage in "[a] lint-picking critique ... to undermine ... [the Tribunal's] conscientious effort merely because it cannot and does not purport to attain anything like the refinement of a mathematical discipline." *Trans World Airlines, Inc. v. CAB,* 385 F.2d at 658.[23]

---

**21.** Intervenor Turner Broadcasting System, Inc. maintains that the Tribunal should have established a separate fee schedule or exception for nationally available "superstations." *See* Turner Brief at 13–18, 22, 32–39. The CRT reasonably determined, however, that the record evidence on this issue was not sufficiently secure to justify the special treatment Turner advocates. *CRT Decision,* 47 Fed.Reg. at 52156; J.A. 21.

**22.** *See supra* pp. 19–21.

**23.** NCTA also claims the Tribunal's decision is "null and void" because not rendered within one year after publication of the notice initiating rate adjustment proceedings as required by 17 U.S.C. § 804(e). *See* NCTA Brief at 28, 48–52; NCTA Reply Brief at 28–32. The CRT here published the initiating notice October 21, 1981, but did not publish its decision in the Federal Register until November 19, 1982.

We reject NCTA's argument. Congress intended the Tribunal to expedite its decision, but nothing in the statutory text or the legislative history suggests the perverse consequence NCTA urges. It would be irrational and wholly unprecedented for a court to direct an agency to scrap a year's hearings and decisionmaking effort and start over because its proceeding did not conclude precisely on time. *See, e.g., Ralpho v. Bell,* 569 F.2d 607, 627 (D.C.Cir.1977) ("Statutes that, for guidance of a governmental official's discharge of duties, propose 'to secure order, system, and dispatch in proceedings' are usually construed as directory, whether or not worded in the imperative, especially when the alternative is harshness or absurdity.") (footnotes omitted); *Fort Worth Nat'l Corp. v. Federal Sav. and Loan Ins. Corp.,* 469 F.2d 47, 58 (5th Cir.1972) ("A statutory time period is not mandatory unless it both expressly requires an agency ... to act within a particular time period and specifies a consequence for failure to comply with the provision.") (citations omitted).

We note the potential for mischief in the course NCTA advocates. Parties resisting administrative action could pursue strategies, for example, overloading the record, calculated to slow proceedings. Agencies rigidly tied to a deadline in the manner NCTA proposes "would become Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v. York Ice Mach. Corp.,* 160 F.2d 432, 435 (2d Cir.) (remark there made in relation to imperfections in jury performances), *cert. denied,* 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947).

CONCLUSION

The 1976 Copyright Act contemplates a rate adjustment proceeding when the FCC changes its rules regulating cable, but provides virtually no instruction as to the factors that bear on the reasonableness of the adjusted rates. Our prior decisions consistently hold that both the Tribunal's rate adjustments and its royalty allocations are subject only to "zone of reasonableness" review. Here, the Tribunal has heard and reviewed reams of evidence, explained why much of that evidence was of only limited utility, and used its expert judgment to devise what it considered fair and reasonable royalty rates to reflect the FCC's rule changes. This is all we can reasonably demand from the Tribunal in view of the mission Congress entrusted to it. If the Tribunal turns out to have misjudged the impact its higher royalty rates will have on the cable industry or on copyright owners, it can reconsider and modify the changes it has ordered in 1985 when its next rate adjustment proceeding will almost certainly occur.[24] See, e.g., National Association of Greeting Card Publishers v. United States Postal Service, 607 F.2d 392, 411 (D.C.Cir. 1979) ("In the initial implementation of a new ratemaking approach, some leeway for approximation and estimation must remain. The courts often uphold regulatory actions on the premise that the approximations will be subject to refinement.") (footnote omitted), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); American Public Gas Association v. FPC, 567 F.2d 1016, 1031 (D.C.Cir.1977) ("When regulation features novelty, in subject, technique, or both, ... the court tempers its review to take into account the 'unusual difficulties' of the first proceeding .... [T]he force of this restraint lessens as the Commission has time and opportunity to gain experience and make adjustments.") (citations omitted), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

For the foregoing reasons, the CRT's decision is

Affirmed.

24. Section 804(b) of the 1976 Act states explicitly that "[a]ny change in royalty rates made by the Tribunal" in the event of FCC alteration of its distant signal and syndicated program exclusivity rules "may be reconsidered in 1980, 1985, and each fifth calendar year thereafter." 17 U.S.C. § 804(b).